59 P.3d 877 (2002)
100 Hawai`i 242
SIERRA CLUB, a California non-profit corporation, Petitioner,
v.
HAWAI`I TOURISM AUTHORITY, by and through its BOARD OF DIRECTORS and Shari W. Chang in her official capacity as Chairperson of the Board of Directors of the Hawai`i Tourism Authority, Respondents.
No. 23080.
Supreme Court of Hawaii.
December 6, 2002.
*880 Isaac Davis Hall, Jr., Wailuku, for Petitioner.
Winfred K.T. Pong (Deborah Day Emerson, Ann M. Ogata-Deal, and John W.K. Chang, with him on the briefs), Deputy Attorneys General, for Respondents.
RAMIL, and ACOBA, JJ.; with NAKAYAMA, J., concurring separately; and MOON, C.J., dissenting, with whom LEVINSON, J., joins.
Opinion by ACOBA, J.
We hold that Petitioner Sierra Club (Petitioner) has not met the three-part "injury-in-fact" test for standing to assert its claim that an environmental assessment (EA) should have been conducted by Respondent Hawai`i Tourism Authority (HTA) prior to its letting of a contract for tourism marketing services. While we are not unsympathetic to the concerns it raises, Petitioner has not established: (1) that it would suffer an actual or threatened injury as a result of the marketing services proposed in the contract; (2) that the alleged or threatened injury is or would be fairly traceable to expenditures for such services; and (3) that such injury, assuming arguendo that it was suffered or threatened, would likely be remedied by a favorable judicial decision. Further, Petitioner's other bases for standing have no merit because (1) an "informational injury" is insufficient to confer standing; (2) Petitioner has not established a procedural right to protect its concrete interests such that it may rely upon "procedural standing"; and (3) a claim that Petitioner can establish standing with its success on the merits is erroneous because standing must be established at the beginning of a case. Accordingly, we dismiss its petition.

I.
The HTA is charged, pursuant to Hawai`i Revised Statutes (HRS)  201B-6 (Supp. 2000), with "responsibil[ity] for developing a strategic tourism marketing plan" for the State.[1] In that connection, the HTA prepared a draft marketing plan dated June 29, 1999 called "Ke Kumu Strategic Directions for Hawai`i's Visitor Industry" or the "Tourism Strategic Plan" (draft TSP).[2] The draft *881 TSP described Hawai`i's unique character as a tourism destination and set forth marketing goals for the HTA.
A "Hawai`i Tourism Product Assessment" report was prepared by KPMG LLP under the direction and guidance of the HTA's Tourism Strategic Plan Committee. KPMG LLP "gathered extensive community-wide in-put about tourism from four major stakeholder groups: Hawai`i visitors, residents, private businesses, and government." PricewaterhouseCoopers LLP submitted an assessment of the draft TSP, entitled "Comparative Strategic Assessment of Hawai`i Tourism Executive Summary" and dated June 29, 1999. PricewaterhouseCoopers utilized the assessment compiled by KPMG LLP and arrived at certain major findings and conclusions.
In a June 30, 1999 press release, the HTA informed the public that community meetings would be held to consider the draft TSP. The press release indicated that copies of the draft TSP and the assessment studies would be available at the HTA's office, at major libraries throughout the state, and on the HTA's website. The draft TSP and the two assessment studies were submitted for evaluation at ten public community meetings conducted throughout Hawai`i from July 13 to July 29, 1999. Copies of these documents were also made available to the public at these meetings. Affidavits submitted by Petitioner indicate that its members attended the community meetings and submitted comments and objections.
On August 2, 1999, the HTA issued a request for bids on a "Proposal for Tourism Integrated Marketing Management Services" (the Marketing RFP [(Request for Proposal procedure)]). The Marketing RFP solicited "proposals specifically for the overall administration of the marketing services for all specified major market areas (MMAs)."[3] As the "Project Goal," the Marketing RFP emphasized that the HTA "[was] seeking a vendor to provide management of global Tourism Integrated Marketing Services for the State of Hawai`i[4] that contribute to the goal of an average annual growth rate of approximately 4.6% in visitor expenditures through the year 2005."[5] (Emphasis added.) In that *882 respect, the draft TSP, which was provided to the bidders, reemphasized that
[t]he HTA's priority is to achieve managed growth of Hawai`i's tourism industry by focusing on increasing visitor expenditures. Cognizant of Hawai`i's finite wealth of natural resources, the HTA recognizes that growth in visitor arrivals is secondary to growth in visitor expenditures.

(Emphasis added.)
The Marketing RFP identified seven "Overall Project Goals" for the contractor, as follows:
1. Increase promotional presence and brand identity to more globally competitive levels to optimize performance in each MMA.
2. Structure marketing efforts to stimulate demand during shoulder periods (spring and fall).
3. Develop and execute cooperative programs with travel partners to optimize use of HTA resources for brand marketing.
4. Support TV and film initiatives that provide cost-effective, high-profile exposure through liaison with State and County film offices.
5. Place increased emphasis on U.S. West, U.S. East and Japan.
6. Place sustained emphasis on Europe and Canada.
7. Place developing emphasis on Other Asia, Oceania and Latin America.
(Boldfaced emphases in original and underscored emphases added.) "[A]n annual calendar year budget of approximately $38 million" was set for the contract. The contract was "for a minimum of 3 years with an option to renew to the successful Contractor" and would be "effective January 1, 2000."
On September 15, 1999, the HTA selected the Hawai`i Visitors and Convention Bureau (HVCB) as the contractor, subject to successful contract negotiations. On February 28, 2000, the HTA and the HVCB executed a contract pursuant to HRS  201B-12(b) (Supp.2000)[6] (the marketing contract). The marketing contract, effective as of January 1, 2000, provided that $117 million was available to fund the agreement over its term. However, the contract is subject to certain legal conditions. The Marketing RFP provided that the contract "may be terminated during its term at the discretion of the HTA for reasons such as non performance of the Contractor, change in the administration and/or funding for this program, or for the convenience of the state."

II.
On January 11, 2000, Petitioner filed a petition for declaratory and injunctive relief (Petition) under HRS  201B-15 (Supp. 2000),[7] which vested this court with original *883 jurisdiction[8] in any action to which the HTA is either a party or in which questions arise as to the validity of any HTA action. The petition challenged the action of the HTA by its Board of Directors and Shari Chang, Chairperson of the Board [hereinafter, collectively, HTA], "in approving the expenditure of $114 million[9] in state funds during the years 2000-2002 for advertising and marketing services without first preparing an [EA]" under HRS  343-5(a) (1993).[10] An EA is "a written evaluation to determine whether an action may have a significant effect." HRS  343-2 (Supp.2000). The term "significant effect" is defined as
the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State's environmental policies or long-term environmental goals as established by law, or adversely affect the economic welfare, social welfare, or cultural practices of the community and State.
HRS  343-2. HRS  343-5(b) (Supp.2000) provides in relevant part that an agency such as the HTA "shall prepare an [EA] for such action at the earliest practicable time to determine whether an environmental impact statement [(EIS)] shall be required." An "EIS" is defined as follows:
[A]n informational document prepared in compliance with the rules adopted under section 343-6 and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.
HRS  343-2.
In its petition, Petitioner claims standing to bring this action because, inter alia, (1) it is a national conservation organization (paragraph 11 of the petition), (2) some of its members reside in areas that will experience alleged adverse impacts (paragraph 12), (3) its members' interests "encompass a variety of economic, educational, cultural, religious, aesthetic, scientific, environmental, health, and recreational uses of areas directly and indirectly affected by the HTA's project" (paragraph 13), (4) the expenditure of funds over three years will result in increased tourist travel to the islands (paragraph 34), (5) *884 the HTA's actions "directly, immediately and adversely affect Petitioner's organizational interests, and its members' use and enjoyment of the land, air and waters will be impaired" (paragraph 14), (6) the lack of an EA means the HTA's "decisions will be uninformed and will adversely affect the Petitioner" (paragraph 15), (7) there is "a risk that serious environmental impacts will be overlooked" (paragraph 16), and (8) "Petitioner has been and will be frustrated in its ability to participate in the debate and decision-making over the [HTA]'s program" (paragraph 17).
Petitioner prayed, among other things, that this court: (1) enter an order declaring that "[the HTA] is ... implementing and expending State funds, in violation of Chapter 343, without the preparation of a required [EA]" and that "[the HTA] is violating one of the . . . purposes of HRS Chapter 343 which is to insure that environmental concerns are given appropriate consideration in decision-making"; (2) enter "an Order requiring [the] HTA to prepare an [EA]"; (3) issue "a mandatory injunction" directing the HTA "to abandon the proposed project or to prepare an EA"; and (4) impose "a temporary restraining order, preliminary injunction, and permanent injunction against the [HTA]," the expenditure of "any State funds[,] or from selecting any alternative studies or filing or pursuing applications for approvals, until . . . an acceptable EA is prepared[.]"
In its February 16, 2000 answer, the HTA alleged, inter alia, that it was without information or belief as to the truth or falsity of the allegations in paragraphs 11 and 13, denied the allegations in paragraphs 12, 14, 15, 16, 17, and 34, and asserted sixteen other defenses to the petition, including the defense that Petitioner lacked standing.
On March 3, 2000, the HTA filed a motion for summary judgment, in which it contended that an EA was not required before the expenditure of state funds.[11] Petitioner filed its own motion for summary judgment on March 8, 2000. In its motion, Petitioner asserted that it had standing to prosecute this action because (1) its members' environmental interests were injured in fact or are threatened with injury as claimed in the members' affidavits attached to its motion and (2) Petitioner suffered "informational injury in fact" and "injury from increased likelihood of an erroneous decision." As to injury to the environment, Petitioner's motion for summary judgment summarized its members' affidavits as follows:
Each of the Affiants is or may be injured because of the public infrastructural deficits that will be exacerbated. Traffic congestion, particularly moving along roadways well-traveled by visitors, will increase unabated. There has been no demonstration that these islands have the "carrying capacity" to accommodate the increased numbers of visitors proposed by the HTA.

Competition to enjoy Hawai`i's precious resources, particularly beaches, will only increase[,] harming recreational interests and causing adverse social impacts. The increase in the number of visitors will increase alien species introductions to Hawai`i through its airports[,] causing increased harm to agriculture, agricultural exports, watersheds relied upon for public drinking purposes, eco-systems, parklands, public health and tourism itself.
(Emphases added.) In its March 15, 2000 memorandum in opposition to Petitioner's motion for summary judgment, the HTA argued, *885 inter alia, that Petitioner lacked standing to challenge the HTA's implementation of the draft TSP and award of the marketing contract.[12]

III.
While we are cognizant of the concerns raised by Petitioner, we hold that Petitioner lacks standing to assert its claims for relief in this case. "Standing is concerned with whether the parties have the right to bring suit." Mottl v. Miyahira, 95 Hawai`i 381, 388, 23 P.3d 716, 723 (2001) (quoting Pele Defense Fund v. Puna Geothermal Venture, 77 Hawai`i 64, 67, 881 P.2d 1210, 1213 (1994)). "A plaintiff without standing is not entitled to invoke a court's jurisdiction." Id. (citing Akinaka v. Disciplinary Bd. of Hawai`i Supreme Court, 91 Hawai`i 51, 55, 979 P.2d 1077, 1081 (1999) (other citations omitted)). Accordingly, Petitioner must establish its standing for this court to exercise jurisdiction over this case. See United Pub. Workers, Local 646 v. Brown, 80 Hawai`i 376, 381, 910 P.2d 147, 152 (App.1996) (stating that "[t]he burden of establishing that the standing requirements have been satisfied rests upon [the union]" in a case where the union appealed a Labor Relations Board decision).
"[T]he crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf." Mottl, 95 Hawai`i at 389, 23 P.3d at 724 (internal quotation marks and citations omitted).
In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's... conduct;[13] (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury.
Id. (citation omitted) (emphasis added). Since the test is stated in the conjunctive, Petitioner must satisfy all three prongs to establish its standing.[14] It has the burden of proof with respect to the injury-in-fact test:
Since [the injury-in-fact elements for standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation .... At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.] *886 Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted). Because this case proceeded to the summary judgment stage, we may consider the affidavits submitted in support of summary judgment as well as the factual allegations set forth in the petition.
In applying this three-part test in cases involving environmental concerns and native Hawaiian rights, this court's opinions have moved "from `legal right' to `injury in fact' as the ... standard ... for judging whether a plaintiff's stake in a dispute is sufficient to invoke judicial intervention[,]" Life of the Land v. Land Use Comm'n, 63 Haw. 166, 174, 623 P.2d 431, 439 (1981), from "economic harm . . . [to inclusion of] `[a]esthetic and environmental well-being'" as interests deserving of protection, In re Hawaiian Elec. Co., 56 Haw. 260, 265 n. 1, 535 P.2d 1102, 1105 n. 1 (1975) (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)), and to the recognition that "a member of the public has standing to ... enforce the rights of the public even though his [or her] injury is not different in kind from the public's generally, if he [or she] can show that he [or she] has suffered an injury in fact[.]" Akau v. Olohana Corp., 65 Haw. 383, 388, 652 P.2d 1130, 1134 (1982). Thus, while the basis for standing has expanded in cases implicating environmental concerns and native Hawai`ian rights, plaintiffs must still satisfy the injury-in-fact test.

IV.
Petitioner's assertion that an EA should have been prepared is premised on the HTA's approval of an expenditure of funds for the marketing contract. Insofar as Petitioner claims that the expenditures would result in injury to the environment, the pertinent "conduct" for purposes of applying the injury-in-fact test is the expenditure of funds under the marketing contract, while the actual or threatened injury is that set forth in the affidavits of Petitioner's members.[15]
In this respect, the first prong of the test Petitioner must satisfy is that it "suffered an actual or threatened injury as a result of the defendants' conduct[.]" Mottl, 95 Hawai`i at 391, 23 P.3d at 726 (citation omitted). According to Petitioner, the HTA's funding of the marketing contract will lead to an increase in the number of visitors, which in turn will adversely impact the environment. This allegation requires us to infer that more visitors will come to Hawai`i as a result of the marketing program. However, while Petitioner appears to assume that the project will bring more visitors, the expressed goal of the Marketing RFP was "an average growth rate of approximately 4.6% in visitor expenditures." (Emphasis added.) "Growth in visitor arrivals" was "secondary" because the HTA "[re]cogniz[ed] ... Hawai`i's finite wealth of natural resources." It is not evident, then, that the HTA's marketing program did or would result in an increase in visitor arrivals.
Moreover, Petitioner's affidavits with respect to traffic congestion and crowded recreation areas lack sufficient specificity to be accepted as factual allegations of injury resulting from the HTA's conduct. Insofar as the affidavits assert that the persons observed in recreational areas were tourists, the affiants fail to present any facts demonstrating the basis for their conclusions, much less that the presence of such tourists was the result of the HTA's marketing program.
Similarly, with regard to general laments about increased traffic and use of recreational areas, the affidavits do not establish that such conditions are the result of the HTA's marketing program, as distinguished from other causes, or of non-tourists. The proposition that an increased introduction of alien species is or will be the result of the marketing program suffers from the same infirmity. *887 Cf. Hawai`i Cmty. Fed. Credit Union v. Keka, 94 Hawai`i 213, 222, 11 P.3d 1, 10 (2000) ("Pursuant to [Hawai`i Rules of Civil Procedure] Rule 56(c), ... affidavits in support of a motion for summary judgment shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." (Internal quotation marks and citations omitted.)).
Finally, it would appear self-evident that tourists visit the state for various reasonsÔÇö reasons that may be wholly unrelated to the HTA's expenditures or its marketing program. The affidavits fail to account for the existence of other factors or variables that may in fact be the cause of the injuries claimed.
Accordingly, Petitioner's claim differs from those in other environmental cases in which the conduct challenged concretely affected or threatened the plaintiff's interests. See Ka Pa`akai O Ka`aina v. Land Use Comm'n, 94 Hawai`i 31, 35-36, 7 P.3d 1068, 1072-73 (2000) (petitioner had standing to challenge land use reclassification to build 530 single family homes, 500 low-rise multi-family units, a 36-hole golf course, an 11-acre commercial center, a 3-acre recreation club, and a golf clubhouse on historic lava flow region associated with native Hawai`ian culture and history, linked to King Kamehameha I, Kameeiamoku, and his twin brother); Mahuiki v. Planning Comm'n, 65 Haw. 506, 515, 654 P.2d 874, 880 (1982) (petitioners, adjacent landowners, had standing to invoke judicial review to challenge "decision to permit the construction of multi-family housing units on undeveloped land in the special management area" because injury was considered "personal" or "special"); Akau, 65 Haw. at 384, 390, 652 P.2d at 1132, 1135 (plaintiffs had standing to bring class action to enforce rights-of-way along once public trails to the beach that crossed defendants' property because "difficulty in getting to the beach hampers the use and enjoyment of it and may prevent or discourage use in some instances"); Life of the Land v. Land Use Comm'n, 61 Haw. 3, 8, 594 P.2d 1079, 1082 (1979) (plaintiff had standing to challenge development project for which variance or modification was sought to include a high density multiple-family dwelling because "urbanization w[ould] destroy beaches and open space now enjoyed by members and decrease agricultural land presently used for the production of needed food supplies," where members resided in "immediate vicinity" of construction area); East Diamond Head Ass'n. v. Zoning Bd. of Appeals, 52 Haw. 518, 521-22, 479 P.2d 796, 798-99 (1971) (appellants had standing to challenge movie operation that interfered with the enjoyment of their property because "evidence of an increase in noise, traffic, and congestion ..., inconvenience by electrical and telephone work crews, and a fear that studio's facilities would permanently remain and detract from the aesthetic residential character of the neighborhood" showed that each appellant was a "person aggrieved"); Dalton v. City and County of Honolulu, 51 Haw. 400, 403, 462 P.2d 199, 202 (1969) (petitioners living across the street from proposed highrise apartment building site had standing because restricted scenic view, limited open space, and increased population in the area created a "concrete interest" in a "legal relation" (internal quotation marks and citation omitted)). Petitioner, then, has not established that the injuryÔÇöclaimed or threatenedÔÇöresulted or will result from the HTA's conduct.[16]

V.
Under the second element of the test, Petitioner must establish a causal connection between *888 the injury suffered and the action at issue. While Petitioner's members' affidavits are replete with complaints, none of the affidavits establish that any purported actual or threatened injury is or would be traceable as a matter of fact to HTA's expenditure of funds.
The affidavits of Petitioner's members assume that the expenditure of funds must have resulted or would result in an increased number of tourists who will, in turn, cause injury to their interests. To establish a logical nexus as required by Life of the Land, 63 Haw. at 173 n. 6, 623 P.2d at 439 n. 6, between the expenditure of funds and the injuries alleged, several premises must be accepted, that is, (1) that the marketing expenditure is for the purpose of persuading visitors to come to Hawai`i, (2) that the visitors' decision to come to Hawai`i was a result of the marketing expenditure, (3) that the visitors' activities in Hawai`i directly affected or will affect a discrete interest that Petitioner has identified, and (4) that the visitors have adversely affected or will adversely affect that interest. But factual allegations substantiating the nexus between expenditure and injury are not contained in the petition or in the affidavits; indeed, they are entirely absent. See discussion supra.
The assumptions and inferences Petitioner would have us draw are not supported by the record or any case. See Mottl, 95 Hawai`i at 395, 23 P.3d at 730. "Advertising" and "Marketing" are not defined in the Marketing RFP. "Absent an ambiguity, contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech." Aickin v. Ocean View Invs. Co., 84 Hawai`i 447, 457, 935 P.2d 992, 1002 (1997) (quoting Cho Mark Oriental Food, Ltd. v. K & K Int'l, 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992)). "Resort to legal or other well accepted dictionaries is one way to determine the ordinary meaning of certain terms." State v. Lian-Wen Chen, 77 Hawai`i 329, 337, 884 P.2d 392, 400 (App.) (internal quotation marks and citation omitted), cert. denied, 77 Hawai`i 489, 889 P.2d 66 (1994). As generally understood, "advertising" is "the action of calling something (as a commodity for sale, a service offered or desired) to the attention of [persons]," Webster's Third New Int'l Dictionary 31 (1966), and "advertise" means "to describe or present (a product, organization, idea, etc.) in some medium of communication in order to induce [persons] to buy, support, or approve of it." Id. at 20. "Marketing" is "the act or process of selling or purchasing in a market[;] ... the process or technique of promoting, selling, and distributing a product or service[.]" Merriam Webster's Collegiate Dictionary 712 (10th ed.1993). The seven project goals as set forth in the Marketing RFP are broad and general and lack a reference to any specific action. The process of advertising and marketing described is but merely one step in a long chain of events, which may or may not lead to the outcome sought. As a result, the effect of advertising and marketing expenditures, without more, may be indefinite and uncertain. To that extent, any injury claimed by Petitioner suffers from conjecture and speculation:
Such a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury. Most, if not all, of the individual links in the chain alleged by appellants depend on some allegation that cannot be easily described as true or false; as noted, we routinely refuse to permit such predictive assumptions to establish standing. See United Transportation Union [v. ICC], 891 F.2d [908,] 911-13 [(D.C.Cir.1989), cert. denied, 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990)]. Also, most, if not all, of these links inescapably presume certain "independent actions of some third party not before this court." Simon [v. Eastern Kentucky Welfare Rights Org.], 426 U.S. [26,] 42, 96 S.Ct. 1917, 48 L.Ed.2d 450 [(1976)].
Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 670 (D.C.Cir.1996) (holding that injury-in-fact test was not satisfied and plaintiffs did not have standing to bring action where no EIS was prepared upon Secretary of the Treasury's extension of a tax credit for use of certain gasoline-ethanol blends to use of *889 blends of gasoline and a fuel additive derived from but not containing ethanol; injury was based on a "lengthy chain of conjecture").
Because Petitioner must rely on a chain of conjecture, ultimately resting on the "independent actions of ... third part[ies]," id., such as the actions of hypothetical tourists not before this court, there is no discernable link fairly traceable between the HTA's expenditure and Petitioner's injury within the scope of the injury-in-fact test. Curbs on marketing expenditures such as those advocated by Petitioner more appropriately present political questions in which "value preferences" are asserted, rather than "issues [for] judicial (or quasi-judicial) proceedings." Public Access Shoreline Hawaii v. Hawai`i County Planning Comm'n, 79 Hawai`i 425, 434 n. 15, 903 P.2d 1246, 1255 n. 15 (1995) (internal quotation marks and citation omitted), cert. denied, Nansay Haw. v. Public Access Shoreline Haw., 517 U.S. 1163, 116 S.Ct. 1559, 134 L.Ed.2d 660 (1996).
The assumption, such as it is, that there is a direct correlation between an expenditure and the number of tourists visiting Hawai`i, would, in this context, amount to conjecture and speculation. See Mottl, 95 Hawai`i at 394-95, 23 P.3d at 729-30 (plaintiff did not have standing because allegation that the withholding of six million dollars from the University of Hawai`i's appropriation resulted in a loss of support for working conditions, teaching programs, research programs, and other programs could not be directly traced to the alleged injury, as it "merely invites this court to infer that the plaintiffs, or at least some of them, were actually affected"); Kaapu v. Aloha Tower Dev. Corp., 74 Haw. 365, 392, 846 P.2d 882, 893 (1993) (plaintiff did not have standing to challenge redevelopment project where court established that "the record before [it was] devoid of both a causal connection between the alleged injury [of cultural significance] and [defendant]'s use of the [`request for proposal'] procedure" as the mode of selection for a developer). See also Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (petitioner did not have standing, even though the injury was traceable to the challenged action, where petitioner failed to allege that it or its members would be affected).
Consequently, Petitioner fails to establish the necessary causal connection between the HTA's conduct and its claimed injury that was present in other cases in which this court has sustained a claim of standing. See Ka Pa`akai O Ka`aina, 94 Hawai`i at 43, 7 P.3d at 1080 (petitioner had standing to challenge Land Use Commission's action because such action would be responsible for "endanger[ing] its members' gathering activities and negatively impact[ing] their access rights"); Citizens for the Protection of the N. Kohala Coastline v. County of Hawai`i, 91 Hawai`i 94, 101, 979 P.2d 1120, 1127 (1999) (petitioner had standing to challenge development project because its members' "use [of] the shoreline area within dozens of feet of [the] ... proposed structures ... is potentially harmed by the project" (internal quotation marks omitted)); Richard v. Metcalf, 82 Hawai`i 249, 255, 921 P.2d 169, 175 (1996) (plaintiff established standing where accidental "injury [wa]s fairly traceable to the [Department of Commerce and Consumer Affairs]' adoption of [a statute]"); Bush v. Watson, 81 Hawai`i 474, 479, 918 P.2d 1130, 1135 (appellants adequately established grounds for standing where injury resulting from Hawai`ian Homes Commission's violation of trust duties by failing to represent interests of Hawaiians wanting to become economically self-sufficient was "traceable to the HHC's approval of [certain third party agreements]"), reconsideration denied, 82 Hawai`i 156, 920 P.2d 370 (1996), cert. denied, Albino v. Machado, 519 U.S. 1149, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997); Pele Defense Fund v. Paty, 73 Haw. 578, 594, 837 P.2d 1247, 1258 (1992) (petitioner had standing to challenge exchange of publicly ceded lands because "[petitioner's economic and/or aesthetic] injuries [that resulted from a transfer of trust lands in contravention of trust terms] are traceable to the alleged breach of trust"), cert. denied, 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993).

VI.
In attempting to draw a connection between expenditures under the marketing *890 contract and an increase in the number of visitors, Petitioner alleged: (1) that "[a] study prepared by Longwoods International" concluded that "an emergency advertising campaign" in 1997 in which the State of Hawai`i spent ten million dollars, "brought" more than 800,000 visitors to Hawai`i from the mainland and Japan; (2) that four million dollars spent in the United States "influenced an estimated 496,000 additional visits from the mainland in 1998 and 1999"; (3) that a "$6 million expenditure in Japan influenced an additional 314,000 trips over the two-year period following the campaign from Japan"; and (4) that "[i]t is probable that the expenditure of $114 million in State funds over three years in the United States and in Japan, and other international locales, will result in like increases in the number of tourists visiting the major islands constituting the State of Hawai`i."[17] (Emphases added.) For this allegation, the petition apparently relies on a September 15, 1999 press release by HVCB discussing the Longwoods Study. The press release, which is referred to in a footnote[18] to Petitioner's memorandum in support of its motion for summary judgment, is attached as an exhibit to the motion. The exhibit, of course, constitutes hearsay.[19]
Hearsay aside, the petition does not evince any factual connections between the 1997 campaign discussed in the Longwoods Study and the marketing project in this case, except that they both involve expenditures of money. The petition does not indicate the purpose of the Longwoods Study, the data underlying its conclusions, how expenditures "brought" visitors or "influenced" their trips to Hawai`i, or the manner in which any of the above was determined. The apparent objective of the 1997 advertising campaign was to increase visitor arrivals.
However, as described, the express objective of the marketing contract is to increase expenditures by visitors. Nothing in the petition or the press release indicates that the "emergency" advertising campaign was similar to the marketing program mandated under the Marketing RFP. There is no mention that the marketing methodology used in the "emergency" campaign is the same as that employed under the marketing contract. Petitioner's submissions do not substantiate that the circumstances surrounding the period covered by the study were the same or similar to the period covered by the marketing contract. Consequently, in the absence of a demonstrated similarity between the 1997 campaign and the marketing contract, the Longwoods Study cannot support Petitioner's contention that the present marketing project would result in an increase in the number of visitors.[20]

*891 VII.
We have concluded that Petitioner's allegations in its petition and summary judgment affidavits fail to allege or create a genuine issue of material fact as to whether there is an actual or threatened injury resulting from the HTA's conduct or that the injury is fairly traceable to the HTA's challenged action. Further, we do not believe that "the injury is likely to be remedied by" this court's grant of injunctive or declaratory relief. Mottl, 95 Hawai`i at 391, 23 P.3d at 726 (citation omitted).
As stated, the goal of the marketing contract is an increase of expenditures by tourists. Assuming that tourists have expended or would expend more because of the project, there is nothing in the record indicating that an increase in tourist expenditures resulted in or would result in increased use or burdens on the interests identified by Petitioner. Assuming, further, that the project resulted in a growth in the number of visitors, nothing suggests that an abandonment of the marketing project would obviate the impact on Petitioner's particular interests. Obviously, marketing campaigns by other entities, including hotel, transportation, and tour companies, would not be curtailed by granting Petitioner the relief requested. Moreover, as indicated supra, Petitioner's members' affidavits fail to account for the effect of other factors or of non-tourists on their interests; that effect would not be precluded by the judicial relief requested.
In contrast to the instant case, standing has been granted where the court's intervention would result in preventing the injuries suffered. See Richard, 82 Hawai`i at 251, 255, 921 P.2d at 171, 175 (in a case where a plaintiff brought a suit against the State Insurance Commissioner and the Department of Commerce and Consumer Affairs for declaratory judgment that a no-fault insurer was not subject to peer review procedures to resolve treatment requests for injuries which occurred prior to the effective date of amendments to fee schedule and peer review statutes, the plaintiff had standing because, inter alia, "a decision precluding use of peer review procedures with respect to treatment requests for motor vehicle accidents that occurred prior to January 1, 1993 would likely provide relief for [the plaintiff]'s alleged injury"); Bush, 81 Hawai`i at 476-79, 918 P.2d at 1132-35 (in a case where Native Hawai`ian homestead lessees challenged certain third party agreements (TPAs) between other lessees and non-Hawaiian farmers as violating the Hawaiian Homes Commission Act, requested declaratory and injunctive relief, and alleged that the Hawai`ian Homes Commission's approval of the TPAs injured them by unduly burdening their commercial farming interests, the plaintiffs established standing, inter alia, because "invalidation of the TPAs would allow the [plaintiffs] to pursue commercially viable farming efforts"); Pele Defense Fund, 73 Haw. at 594, 837 P.2d at 1258 (in a case where a nonprofit corporation challenged a state's decision to exchange public ceded lands, alleging, inter alia, a breach of trust under section 5(f) of the Admission Act, the plaintiff established its standing because, inter alia, "the requested relief[, i.e., an injunction remedying the State's breach of its trust obligations,] would be likely to remedy the injuries by giving beneficial use of the exchanged land to trust beneficiaries").
In sum, we cannot say in this case that the purported injury is likely to be remedied by a favorable decision.[21]See Kaapu, 74 Haw. at 392-93, 846 P.2d at 893-94 (in a case where a plaintiff challenged the state agency's selection method for a developer with which it would negotiate the terms of a long-term development of the Aloha Tower complex (i.e., the RFP), the plaintiff did not have standing because, inter alia, "there has been no showing that [the alternative selection procedures] would have protected [the plaintiff]'s interests ... to a greater extent than the RFP system actually utilized"). Thus, we hold that Petitioner has failed to establish the third prong of the "injury-in-fact" test, i.e., that its "injury is likely to be remedied by a favorable decision." Mottl, 95 Hawai`i *892 at 391, 23 P.3d at 726 (internal quotation marks and citation omitted).

VIII.
Separate from its allegations regarding adverse impacts on the environment, Petitioner makes three other claims.

IX.
In its summary judgment motion, Petitioner maintains that it has suffered an "informational injury in fact." There is no Hawaii case law on "informational injury." In Foundation on Economic Trends v. Lyng, 943 F.2d 79 (D.C.Cir.1991), the United States Court of Appeals for the District of Columbia Circuit held that "an organization's standing in a NEPA case" cannot be sustained "solely on the basis of `informational injury,' that is, damage to the organization's interest in disseminating the environmental data an impact statement could be expected to contain." Id. at 84. The court acknowledged that, while there was "the logical appeal" of extending standing on such a basis, id., such an approach "would potentially eliminate any standing requirement in NEPA cases, save when an organization was foolish enough to allege that it wanted the information for reasons having nothing to do with the environment." Id.
Moreover, the court observed that "[t]he proposition that an organization's desire to supply environmental information to its members, and the consequent `injury' it suffers when the information is not forthcoming in an impact statement, establishes standing without more also encounters the obstacle of Morton, [supra]." Id. at 84-85. "The Supreme Court there held ... that a mere interest in a problem, no matter how long-standing the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient to confer standing." Id. at 85 (internal quotation marks and citation omitted). We agree with Lyng's reasoning. An "informational injury" does not establish an injury required for standing.

X.
Petitioner also contends that it has sustained an injury from the "increased likelihood" of an erroneous decision, because "agency decision-makers are not adequately informed as to the nature and extent of environmental impacts, real environmental harm will occur through inadequate foresight and deliberation." (Quoting Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir.1989)). We construe this argument as one of "procedural standing," alluded to by the U.S. Supreme Court in dicta in Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For the reasons stated in Part XII, infra, we do not agree with this argument.

XI.
Finally, Petitioner asserts that a "plaintiff's belief that it can establish standing with its success on the merits" is not persuasive because standing must be established at the beginning of the case. Atlantic States Legal Found. v. Babbitt, 140 F.Supp.2d 185, 194 (N.D.N.Y.2001). The district court pointed out that
[t]he doctrine of standing is intended to ensure that a plaintiff has an interest in the litigation at the outset of suit. For this reason, standing must be established in the beginning rather than end of litigation. See Cook v. Colgate Univ., 992 F.2d [17,] 19 [(2d Cir1993)]. If the court were to adopt plaintiff's position, it would effectively ignore this fundamental maxim of long established jurisprudence.
Id. We also agree with Babbitt. Because "standing must be established in the beginning" of a case, id., Petitioner's allegations of "informational injury" and "injury resulting from increased likelihood of an erroneous decision" must satisfy the injury in fact test. The so called "informational injury" and "injury from increased likelihood of an erroneous decision" are not "distinct and palpable" but, under the circumstances, are conjectural and "hypothetical" injuries. Mottl, 95 Hawai`i at 389, 23 P.3d at 724 (internal quotation marks and citation omitted). We hold then that Petitioner's allegations have failed *893 to establish an "injury" under the injury-in-fact test.

XII.
We observe that reference to "procedural standing" within the parties' pleadings is scant, at best, and that, as such, this issue has not been adequately briefed by either party. Petitioner's entire argument on this subject is four sentences long,[22] and, although Respondent's response addresses standing generally, it does not discuss "procedural injury" at all. However, since this issue has been seized upon by the concurrence and dissent, we address it here.
We note further that, with all due respect, it is incongruous for the dissent to conclude that Sierra Club has standing but at the same time maintain that it need not say what its position would be as to the merits of the present case. Such an indication would not be "futile," because if in fact the dissent would hold against the Petitioners on the merits, its true position should be a concurrence with the result herein, in the form of a decision concurring in part and dissenting in part. For example, even if the dissent determines that there is standing, that would not necessarily alter the result in this case inasmuch as the dissent's position might, for example, conform with one of the positions taken by the HTA, i.e., that the HTA is not an agency, and therefore is not under an obligation to produce an EA.[23] We would not find that argument meritorious.

A.
Procedural standing is a construct based on federal statutes and has been applied in federal lawsuits when a plaintiff seeks review of an administrative decision pursuant to "citizen-suit" provisions.[24] In environmental suits, in which this construct has principally been applied, plaintiffs may sue for NEPA violations under the federal Administrative Procedures Act (APA), 5 USCS  702 (2001), see, e.g., Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), because NEPA does not have its own provision providing for judicial review, and independently under the Endangered Species Act (ESA), 16 U.S.C.  1536(n) (2001), see, e.g., Florida Key Deer v. Stickney, 864 F.Supp. 1222 (S.D.Fla.1994), which contains its own citizen-suit provision. Procedural injury standing modifies the traditional constitutional requirements for asserting *894 an injury under some conditions. Under federal decisions, once a plaintiff establishes a procedural injury, the plaintiff may not be required to meet normal thresholds of some of the other elements of standing. See Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.").
Qualification for procedural standing in federal court is said to require satisfaction of a two-part test.[25] "To establish procedural standing, the plaintiff must show: (1) that it has been accorded a procedural right to protect its concrete interests, and (2) that it has a threatened concrete interest that is the ultimate basis of its standing." Churchill County v. Babbitt, 150 F.3d 1072, 1078 (9th Cir.1998) (citations omitted). In connection with the first requirement, the procedural right to protect concrete interests must be granted pursuant to the challenged statute. See Douglas County v. Babbitt, 48 F.3d 1495 (9th Cir.1995) ("[S]ome of our cases and some language in Lujan require that plaintiffs have a right conferred by the challenged statute[;] we require that showing in this case.").
For the second step, the plaintiff must show "a threatened concrete interest that is the ultimate basis of its standing[,]" Churchill County, 150 F.3d at 1078 (citations omitted). In addition, when a plaintiff proceeds under the APA, the plaintiff must show, as a prudential standing matter, that the threatened "concrete interests" to be protected fall within the "zone of interests" the challenged statute was designed to protect.[26] Because citizen suit provisions are *895 intended to establish the first requirement, a "procedural right," see supra note 24, most federal courts addressing the issue concentrate solely on the second step, see, e.g., Friends of the Earth v. United States Navy, 841 F.2d 927, 931-32 (9th Cir.1988). However, both steps are crucial in order for a plaintiff to qualify for "procedural standing." See Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130; Douglas County v. Babbitt, supra.
It is evident that the federal construct of a procedural right is not germane in this case because (1) HRS  343-7, the Hawai`i statute at issue, establishes who and under what circumstances the lack of an EA, may be challenged, and (2) federal cases recognizing this standard are inapposite, as they rest on non-analogous statutes. Thus, Petitioner cannot be afforded so-called "procedural standing" under HRS  343-7(a).[27]

B.
The basis for asserting procedural rights, as noted supra, was briefly mentioned by the United States Supreme Court in a footnote in Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130.[28] In Lujan, the U.S. Supreme Court considered whether Defenders, consisting of several environmental groups, had standing to challenge a regulation promulgated by the Secretary of the Interior interpreting  7 of the ESA. See id. at 557-58, 112 S.Ct. 2130.
Section 7 of the ESA required federal agencies to insure that their actions would not harm or threaten endangered species. See id. at 558, 112 S.Ct. 2130. Initially, a regulation had interpreted  7 as extending to actions taken in foreign nations. See id. at 558, 112 S.Ct. 2130. A revised regulation, at issue in Lujan, was promulgated that reinterpreted  7 as pertaining only to actions taken within the United States or on the high seas. See id. at 558-59, 112 S.Ct. 2130.
Defenders filed suit against the Secretary of the Interior in federal District Court, seeking a declaratory judgment that the revision was in error and an injunction requiring the Secretary to promulgate a new rule consistent with the former interpretation. See id. at 559, 112 S.Ct. 2130. The Secretary filed a motion to dismiss for lack of standing, which the district court granted. Id. (citing Defenders of Wildlife v. Hodel, 658 F.Supp. 43, 47-48 (D.Minn.1987)). The Eighth Circuit, by a divided vote, reversed and remanded.[29]Id. (citing Defenders of Wildlife v. Hodel, 851 F.2d 1035 (8th Cir.1988)).
*896 After remand, the case again came up on appeal. On certiorari, the Court addressed, inter alia, the Eighth Circuit's determination that Defenders had standing on the basis of a procedural injury. See id. at 571-72, 112 S.Ct. 2130. The Eighth Circuit had relied upon the citizen suit provision of the ESA, which states that "any person may commence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter." Id. at 572, 112 S.Ct. 2130 (citations omitted.) The Court rejected the proposition that the broadly worded citizen-suit provision, which, in itself, conferred a procedural right upon every citizen, translated into standing, without a concrete interest that was threatened. Id. 572, 112 S.Ct. 2130 (citation omitted). In passing, the Court indicated in a footnote that a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." Id. at 572 n. 7, 112 S.Ct. 2130; see supra note 28. Because the Court determined that Defenders had not alleged sufficient immediacy of harm, the Court did not elaborate on the suggestion of a "procedural injury" doctrine in its footnote.
Subsequent to Lujan, this dicta became the basis for procedural injury standing. Coined "footnote seven standing," see Pacific Northwest Generating Co-op. v. Brown, 38 F.3d 1058, 1065 (9th Cir.1994); Brian J. Gatchel, Informational and Procedural Standing after Lujan v. Defenders of Wildlife, 11 J. Land Use & Envtl. L. 75, 91 (1995), federal courts since Lujan, have analyzed procedural standing as pertaining to the Article III "case or controversy" requirement, see, e.g., Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, (4th Cir.2000).

C.
The federal procedural standing standard relaxes the constitutional requirements somewhat, but only when a potential plaintiff has shown that "(1) it has been accorded a procedural right to protect its concrete interests, and (2) that it has a threatened concrete interest that is the ultimate basis of its standing." Churchill County, 150 F.3d at 1078 (citations omitted). In contrast to the non-specific citizen suit provisions involved in federal decisions which allow "any person" a right to sue, and upon which the concurrence and dissent rely, the provision allowing judicial review in chapter 343 specifically relates to a procedural challenge to the lack of an EA. See Akau v. Olohana Corp., 65 Haw. 383, 390, 652 P.2d 1130, 1135 (1982) ("[T]he legislature may limit standing to sue despite an injury in fact where plaintiff asserts rights that arise from a statute[.] Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)[.]"); Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff."). In HRS  343-7, which pertains to actions relating to "the lack of [an environmental] assessment required under section 343-5," the *897 legislature permitted "judicial action" by "aggrieved parties[,]" as described therein. HRS  343-7(a) provides:

Any judicial proceeding, the subject of which is the lack of assessment required under section 343-5, shall be initiated within one hundred twenty days of the agency's decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started. The council or office, any agency responsible for approval of the action, or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. Others, by court action, may be adjudged aggrieved.

Id. (emphases added). Hence, specifically named parties have an automatic right of action regarding the lack of an assessment required under HRS  343-5:(1)[t]he council or office,[30] any agency responsible for approval of the action, or (2) the applicant. But any other party seeking to challenge "the lack of an assessment . . . under section 343 5" must satisfy the criterion that they are "[o]thers, [who] by court action, may be adjudged aggrieved." Id.

D.
This enumeration of who may assert a right of action may be viewed as the legislature's designation of those parties having a "procedural right" to have an EA statement prepared. As the parties listed in HRS  343-7(a) are the only ones who can enforce the lack of an EA statement, they are the only ones who may arguably assert a "procedural injury" via court action. See Benally v. Hodel, 940 F.2d 1194, 1199 (9th Cir.1991) ("The [Navajo and Hopi] Settlement Act establishes that it is the tribal chairman who can vindicate individual rights in an intertribal dispute[.] ... It is this broad right of action which we read as implying a procedural right in tribal chairman to challenge government compliance with the dictates of the Settlement Act."); Lindahl v. Office of Personnel Management, 718 F.2d 391, 395 (Fed. Cir.1983) ("An express statutory provision that certain decisions of an administrative agency `are final and conclusive and are not subject to review' should not be interpreted as though it said such decisions `are not final and are not conclusive and are subject to some judicial review.").
The distinction drawn in HRS  343-7(a) is between those named parties who could be said to have an unquestioned right of action and "others," who must show that they are aggrieved in some way, in a court action. In mandatory terms, HRS  343-7(a) directs that the council or office, any agency responsible for approval of the action, or the applicant "shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection." (Emphasis added.) In contrast, "others," i.e., those not named supra, "may be adjudged aggrieved" only "by court action[.]" (Emphasis added.)
Thus, "others" must show in a court action brought under  343-7(a) that they are aggrieved and must be adjudged aggrieved, in concert with a challenge to the lack of an EA statement. To be adjudged aggrieved, under our case law, it follows that such parties must satisfy the injury-in-fact test requirements. See, e.g., Public Access Shoreline Hawaii v. Hawai`i County Planning Comm'n, 79 Hawai`i 425, 431, 903 P.2d 1246, 1252 (1995) (requiring that "the claimant's legal interests *898 must have been injuredÔÇöi.e., the claimant must have standing to appeal," as demonstrated by the injury-in-fact test, as one of the requirements for appellate jurisdiction under HAPA).

E.
As set forth supra, in Parts IV-XI, Petitioner has not established in this action the necessary standing, i.e., aggrievement requirements. In the absence of an adjudication to the effect that it has, Petitioner cannot be deemed statutorily-authorized to "bring[] judicial action under [HRS  343-7(a)]" to have the EA statement prepared. It is only in concert with having been adjudged aggrieved that "others," such as Petitioner, have rights under HRS  343-7(a).
Thus, HRS  343-7(a) allows judicial review, but does not contain language affording Petitioner an automatic right to review. Petitioner did not, under the terms of the statute, establish a so-called "procedural right" platform from which it could assert a "procedural injury," in the absence of an actual or threatened injury in fact. See Friends of the Earth, 204 F.3d at 155 ("In addition to meeting the `irreducible' constitutional minimum, an individual must also satisfy any statutory requirements for standing before bringing suit.").

XIII.

A.
Further, Petitioner's reliance on federal cases construing federal statutes is misplaced, inasmuch as HRS  343-7(a) is substantively different.[31] We observe that the federal statutes conferring a procedural right in these cases are far less specific than HRS  343-7. The language of HRS  343-7(a) expressing legislative intent to specifically describe the class of litigants who might challenge the lack of an EA is in plain contrast to the general language employed in NEPA and the APA.[32] The contrast is illuminated by comparison to the two provisions cited by federal cases allowing procedural standing.
In the Endangered Species Act (ESA), the statute pertinent in Lujan, Congress, in a citizen-suit provision, instructed that "any person may commence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter."[33] 16 U.S.C.  1540(g) (quoted in *899 Lujan, 504 U.S. at 571-72, 112 S.Ct. 2130) (emphasis added). Additionally, NEPA, which Petitioner contends is the federal "counterpart" of HEPA[,] although "wider in scope than the federal or typical state analogue[,]" is also inapposite to HRS  343-7(a). NEPA lacks any specific private action language at all; and thus, as previously mentioned, the federal courts rely upon the citizen suit provisions of the APA to provide a right of action.
In relevant part, the APA states that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. 702 (emphasis added). Cases cited by Petitioner, see Sierra Club v. Marsh, 872 F.2d 497 (1st Cir.1989) (addressing an alleged violation of NEPA during the preparation of an EIS, in which Sierra Club participated, without addressing Sierra Club's standing to bring suit), and by the dissent, see Lujan, supra, (ESA); Douglas County, supra (invoking NEPA pursuant to the APA); Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (invoking NEPA and the Federal Land Policy and Management Act (FLPMA) pursuant to the APA); Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445 (10th Cir.1996) (invoking NEPA pursuant to the APA); Sierra Club v. Marita, 46 F.3d 606 (7th Cir.1995) (invoking NEPA and the National Forest Management Act (NFMA) pursuant to the APA); Florida Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C.Cir.1996) (invoking NEPA pursuant to the APA); Sierra Club v. Robertson, 28 F.3d 753 (8th Cir.1994) (same), are, thus, inapposite.

B.
Our counterpart to the APA, the Hawai`i Administrative Procedures Act (HAPA), has not been alleged as a basis for a right of action by Petitioner. See supra note 26. Had it been, there would be no logical basis for employing it, inasmuch as, unlike NEPA, HRS  343-7(a) does contain exact language designating who may challenge the provisions relating to an EA. Also, because HAPA applies only to judicial review of contested case hearings, see HRS  91-14, or declaratory judgments by the circuit court on the validity of an agency rule,[34]see HRS  91-7, or a declaratory order from an agency regarding "the applicability of any statutory provision or of any rule or order of the agency," HRS  91-8, resort to the HAPA would not be an appropriate vehicle in Petitioner's situation.
Petitioner states that, "[t]here is no evidence that [the HTA] ever made any formal determination that an Environmental Assessment or an Environmental Impact Statement was or was not required prior to carrying out or approving the action on September 15, 1999." Thus, there is no contested case hearing held that Petitioner may dispute, there has been no agency rule the validity of which Petitioner may question, nor does Petitioner seek a declaratory order from the HTA. Hence, HAPA is wholly inapplicable to Petitioner's case and requests for relief.
In sum, the federal statutes and case law do not provide an analogue to HRS  343-7(a).

XIV.
Additionally, aside from the plain language of the statute, concluding that federal procedural standing requirements apply in the present case, rather than the traditional "injury in fact" test, would ignore the relevant legislative context in which HRS  343-7 was enacted. Because our case law at the time this provision was passed did not use a "procedural standing" test, the legislature could not have intended this lower threshold to be utilized. In any event, the base line is the express grant to bring suit that is set by the legislature in HRS  343-7. We cannot expand *900 standing beyond what the legislature intended, because that is one of the requirements that a potential plaintiff must meet.

XV.
Having held that Petitioner lacks standing in this case to bring its suit,[35] we dismiss Petitioner's January 11, 2000 petition.
Concurring Opinion by NAKAYAMA, J.
I agree that Sierra Club has not demonstrated it has standing to challenge the Hawai`i Tourism Authority's [hereinafter "HTA"] failure to perform an environmental assessment [hereinafter "EA"], pursuant to Hawai`i Revised Statutes (HRS)  343-5 (1993 & Supp.2001). The plurality concludes that Sierra Club fails to show it has a procedural right because it has not demonstrated it has substantive standing. I do not agree. I believe the purpose of procedural standing is to permit "[o]thers," who allege a procedural violation, to challenge an action before it results in a substantive violation.
However, I believe that even utilizing a procedural standing analysis, Sierra Club has failed to show it has a right under HRS  343-7 (1993)[1] to challenge the HTA's failure to conduct an EA. Sierra Club has not shown that the alleged adverse environmental effects to land can be attributed to the expenditure of money on a marketing plan. Without a sufficient correlation between the agency action and alleged effect, Sierra Club fails to show it has a concrete interest. Absent this, Sierra Club does not have standing in this matter.

A. Procedural standing is appropriate for cases alleging violations of HRS Chapter 343.
Under the procedural injury framework, Sierra Club must show it (1) has been conferred a procedural right to protect a concrete interest under HRS  343-7(a), and (2) has a threatened concrete interest that underlies its basis for standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 572, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); see also Douglas County v. Babbitt, 48 F.3d 1495, 1499 (9th Cir.1995). The Ninth Circuit has interpreted the first requirement as one bestowed by statute: "Because some of our cases and some language in Lujan require that plaintiffs have a right conferred by the challenged statute, we require that showing in this case." Douglas County, 48 F.3d at 1501 n. 4;[2]see also Lujan, 504 U.S. at 573 n. 8, 112 S.Ct. 2130 ("We do not hold that an individual cannot enforce procedural rights; *901 he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."). The plurality reasons that Sierra Club does not have standing because it has no procedural right accorded to it by HRS Chapter 343 [hereinafter "Hawai`i Environmental Procedural Act (HEPA)"]. While I agree with this conclusion, I do not agree with the analysis employed by the plurality.
In summary fashion, the plurality concludes that only parties specifically designated as having automatic standing may assert a procedural injury:
As the parties listed in HRS  343-7(a) are the only ones who can enforce the lack of an EA statement, they are the only ones who may arguably assert a `procedural injury' via court action.... The distinction drawn in HRS  343-7(a) is between those named parties who could be said to have an unquestioned right of action and `others,' who must show that they are aggrieved in some way, in a court action.

All others may be deemed aggrieved by demonstrating substantive standing in a quasi-judicial action, for example a contested case hearing:
Thus, `others' [who seek standing] must show in a court action brought under  343-7(a) that they are aggrieved and must be adjudged aggrieved, in concert with a challenge to the lack of an EA statement. To be adjudged aggrieved, under our case law, it follows that such parties must satisfy the injury-in-fact test requirements.
Therefore, under the plurality's analysis, the only means by which Sierra Club may prove it has a procedural right is to demonstrate it has substantive standing;[3] because Sierra Club did not demonstrate "an actual or threatened injury in fact," it did not establish "a so-called `procedural right' platform from which it could assert a `procedural injury[.]'"
Not only has the plurality failed to cite authority supporting its conclusion, its conclusion poses problems in the application of HRS  343-7. First, it is incongruous to require a prospective plaintiff to prove it has substantive standing in order to show it has a procedural right to allege a procedural harm. Second, the plurality's holding would effectively exclude review of agency action by those designated as "others" until an agency completes its project.
Although this court has construed substantive standing broadly, it is inappropriate to stretch the borders of this limitation to encompass rights conferred that are inherently procedural. For this reason, I agree with the dissent that the federal courts' construction of procedural standing is appropriate as applied to HEPA because, similar to its federal counterpart, NEPA, HEPA sets forth various requirements that are inherently procedural. The plurality's decision misconstrues the nature of the right asserted and the standing requirements imposed upon the parties asserting the injury to that right. As the dissenting opinion notes, HEPA grants procedural, and not substantive, rights and remedies. Substantive laws are notably and manifestly different from procedural ones: "Substantive rights are generally defined as rights which ... create a new obligation, impose a new duty ... as distinguished from remedies or procedural law which merely prescribed methods of enforcing or giving effect to existing rights." Clark v. Cassidy, 64 Haw. 74, 77, 636 P.2d 1344, 1347 (1981) (citations and internal quotation marks omitted).
The main thrust of HEPA is to require agencies to consider the environmental effects of projects before action is taken. It does so by providing a procedural mechanism to review environmental concerns. HRS  343-1 (1993). The legislature explained that HEPA provides an "environmental review process [that] will integrate the review of environmental concerns with existing planning processes of the State and counties and alert decision makers to significant environmental effects which may result from the implementation of certain actions." HRS *902  343-1. One of the procedural tools of HEPA is an EA, which is used to determine circumstances under which a particular action will have a significant effect on the environment. HRS  343-2 (Supp.2001). If the EA concludes that a significant impact is expected, an Environmental Impact Statement (EIS),[4] among other things, must be prepared. HRS  343-2; HRS  343-5(b). If no significant effect is expected, the agency submits a draft EA that must be available for public comment and review. HRS  343-5(b). ("Whenever an agency proposes an action in subsection (a), ... that agency shall prepare an environmental assessment for such action at the earliest practicable time to determine whether an environmental impact statement shall be required. For environmental assessments for which a finding of no significant impact is anticipated, a draft environmental assessment shall be made available for public review and comment for a period of thirty days."). Consequently, HEPA does not confer substantive rights or remedies. To insist that a prospective plaintiff demonstrate substantive standing pursuant to a statute that confers only procedural rights ignores the plain language of HRS  343-7(a).
The procedural standing doctrine[5] was first adopted in Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n, 481 F.2d 1079, 1086 n. 29 (D.C.1973), to avoid such problems. The Scientists' Inst. for Public Info., Inc. court developed procedural standing to address environmental concerns before irreversible agency action could be completed.[6]Id. The circuit court noted that no other means of establishing standing would be sufficient because it would otherwise "insulate administrative action from judicial review, prevent the public interest from being protected through the judicial process, and frustrate the policies Congress expressed in [the National Environmental Procedure Act (NEPA)], a result clearly inconsistent with the Supreme Court's approach to standing." Id. For similar reasons, this court should also adopt the procedural standing doctrine in this case. In Lujan, the Supreme Court noted that the main objective of procedural standing is to allow prospective plaintiffs the ability to meet substantive standing requirements "without all the normal standards for redressability and immediacy" because "[t]here is much truth to the assertion that `procedural rights' are special[.]" Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130. Because claimants need not prove immediacy and redressability, they can invoke judicial review at each stage of a project, before completion.
Substantive standing requires a prospective plaintiff to prove its concrete and particularized interest has been harmed or is in imminent harm. If Sierra Club were to be required to meet this test, it would have to wait until its concrete interests were injured by the completion or near completion of the marketing plan. This result would render HEPA meaningless. Therefore, the plurality's conclusion, that Sierra Club must prove it has substantive standing, would require judicial review of compliance with HEPA only after the necessary stages of a proposed *903 project had been completed and, as a result, considerable expenses consumed. City of Davis v. Coleman, 521 F.2d 661, 670 (9th Cir.1975) ("Thus, if a particular project does in fact entail serious but nonobvious environmental impacts, agency failure to prepare an EIS may mean that the last opportunity to eliminate or minimize these impacts, in accordance with NEPA's broad objectives, has been lost."). To preserve both the purpose and intent of HEPA, I would hold that Sierra Club may attempt to demonstrate that it is aggrieved by proving it has procedural standing.

B. Sierra Club does not have procedural standing because the nexus between the expenditure of funds and harm to the areas designated by Sierra Club members is attenuated.
In addition to demonstrating a procedural right, a prospective plaintiff must also show it has a concrete interest that is the basis for its standing to challenge agency action. Douglas County, 48 F.3d at 1500. However, Sierra Club's allegation that it has a geographic nexus to various sites on the island that may be affected by increased visitor traffic as a result of HTA's marketing plan is not sufficient to establish such a concrete interest in this case. Unlike Douglas and other federal court cases where agency action involved the construction or use of land, HTA's expenditure of moneys on a marketing plan lacks the same close correlation between agency action and use of land. Such a correlation must be established for claims alleging a right pursuant to HRS  343-5 because to do otherwise would create an absurd result-the requirement of an EA for any expenditure of state and county funds.
I would hold that when a prospective plaintiff claims a procedural violation for an agency's expenditure of funds, pursuant to HRS  343-5(a)(1), it must prove (1) a nexus between the use of state and county moneys and the effects on land designated by HRS  343-5(a), and (2) a "geographical nexus" to those lands in order to establish a concrete interest. In this case, Sierra Club has failed to prove it has a concrete interest because the nexus between the HTA's proposed marketing plan and the alleged environmental effects is dependent upon the decisions of independent acts of prospective visitors. The alleged harm is, therefore, too attenuated from the proposed marketing plan.
The Ninth Circuit made clear that an agency's failure to adhere to NEPA does not, without more, satisfy the procedural standing test. Fernandez v. Brock, 840 F.2d 622, 628 (9th Cir.1988). To determine whether a claimant's concrete and particularized interests are potentially threatened by an agency's failure to perform a statutorily mandated procedure, the Ninth Circuit requires an examination of "the statutory language, the statutory purpose, and the legislative history" of the pertinent statute. Id. at 629.
As applied to NEPA, the federal courts have only required that a prospective plaintiff demonstrate it has a geographic nexus to the site of agency action. In City of Davis v. Coleman, 521 F.2d 661, 665-66 (9th Cir. 1975), the plaintiffs alleged a violation of NEPA when the California Department of Public Works and Federal Highway Administration failed to perform an EIS for the proposed construction of a freeway to run three to four miles south of the City of Davis. The Ninth Circuit observed that the purpose of NEPA is to require federal agencies to follow a procedure that considers environmental effects of a proposed action. Id. at 673 (citation omitted). The City of Davis court established what has become the standard test for determining procedural standing; it requires a prospective plaintiff to establish a "geographic nexus" to "the site of the challenged project." Id. at 671 (emphasis added). It held that this test, while broad, was necessary because a prospective plaintiff with such a nexus could be expected to suffer from the environmental consequences of the challenged project. Id. ("Davis has met the test. Because of its proximity to the Kidwell project it may be expected to suffer a wide variety of environmental consequences that it alleges will result from the interchange, if in fact the allegations have substance.").
This geographic nexus requirement was adopted by the Tenth Circuit in Committee to Save the Rio Hondo v. Lucero, 102 F.3d *904 445, 449 (10th Cir.1996). The Committee to Save the Rio Hondo filed suit against the United States Forest Service for failing to comply with NEPA when it granted the Taos Ski Area's proposed amendment to its master plan and special use permit to allow operations during the summer without performing an EIS. Id. at 446. In resolving this case, the Tenth Circuit required a prospective plaintiff to show: (1) that an agency's failure to follow a particular procedure increased the risk of harm to the environment; and (2) this increased risk of environmental harm adversely affected a prospective plaintiff's concrete interests. Id. at 449. The plaintiff demonstrates a concrete interest by establishing that it either has a geographic nexus to or actually uses a site subject to agency action. Id.
In City of Davis and Committee to Save the Rio Hondo, the proposed action involved using land for a specific purpose-construction of a freeway and use of land during both the summer and winter seasons. Even in Douglas, the challenged action involved the failure to comply with NEPA when the Secretary of Interior proposed designating specific acres of land as a critical habitat. Douglas, 48 F.3d at 1498-99. In all of these cases, the courts deemed the prospective plaintiffs aggrieved and conferred standing. The instant case, however, is distinguishable because the challenged agency action does not involve the use of land; it involves the use of funds on an advertising campaign. The geographic sites utilized by Sierra Club members are affected only if the advertising campaign (1) convinces more visitors to travel to Hawai`i, and (2) increases visitor traffic to the sites with which Sierra Club members have a geographic nexus. Unlike City of Davis, Committee to Save Rio Hondo, and Douglas, the challenged agency action does not involve the use of land.
Requiring parties to establish a sufficient nexus between the expenditure of funds and the use of land conforms with the plain construction of HRS  343-5. It is a fundamental precept in statutory construction that each part of a statute must be construed in light of the whole. Norma Singer, Sutherland Statutory Construction,  46:05 (6th ed.2000). Departure from a literal interpretation of a statute is therefore justified if it produces "an absurd and unjust result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act." Pacific Ins. Co. v. Oregon Auto. Ins. Co., 53 Haw. 208, 211, 490 P.2d 899, 901 (1971). HEPA requires an EA to be performed when an agency proposes "the use of state or county lands or the use of state or county funds." HRS  343-5(a)(1) (emphases added). Because the correlation between the expenditure of funds and environmental impact to land is more attenuated than the proposed use of land, conferring standing on those alleging merely a diffuse line of causation between environmental harms and the expenditure of funds would lead to absurd results.
Nearly every provision of HRS  343-5 involves the direct use of land. HRS  343-5 provides, inter alia, that an EA is required for the proposed (1) use of state and county lands, (2) use within any land classified as conservation districts, (3) use within the shoreline area, (4) use within any historic site, (5) use within the Waikiki area, (6) amendments to county plans that would result in designating land as something other than agriculture, conservation, or preservation, (7) reclassification of any land classified as conservation district, and (8) construction of new or modification to existing helicopter facilities that affects land classified as conservation districts.[7] The only exception is the *905 expenditure of funds mandated in HRS  343-5(a)(1). It is clear that the legislature contemplated that the expenditure of funds must have a direct correlation to the use of lands designated in HRS  343-5(a)(2)(8). Therefore, I would hold that HRS  343-5(a)(1) does not support standing to challenge the failure to conduct an EA when a state or county agency simply expends funds. Rather, HRS  343-5(a)(1) requires an EA for those projects that have a sufficient nexus to the purposes intended by the legislature in enacting HEPA.
Sierra Club has not demonstrated a sufficient nexus. It alleges that HTA's proposed marketing plan would increase visitor traffic to the roadways frequently used by Sierra Club members, overuse of the beaches and parks frequented by the members of Sierra Club, the inability to bodysurf unobstructed by visitors in areas used by members of Sierra Club, the inability to enjoy the ocean and air without being interrupted by visitors using helicopters and water-crafts in areas used by members of Sierra Club, the introduction of non-native plants to Hawaii's hiking trails used by members of Sierra Club, and the destruction of foliage to Hawaii's hiking trails used by members of Sierra Club. However, all of the proposed possible effects on the roadways, beaches, and hiking trails used by Sierra Club members cannot be directly attributable to HTA's expenditure of funds. Rather, it is dependent upon the acts of independent actions of third parties not before this court-the visitors who, as a direct response to HTA's marketing plan, must choose to frequent Hawai`i, specifically the areas used by Sierra Club members, in increased numbers. This is not akin to the proposed agency projects that involve the construction of a freeway, commercial use of land during previously off-peak seasons, or designation of land as critical habitat. The effect in this case is much more attenuated and cannot, without more, constitute a concrete interest.
For the above reasons, I concur in the result reached by the plurality but not the reasoning employed by it. Therefore, I would hold that parties asserting a grievance pursuant to HEPA may assert procedural standing. However, because Sierra Club has failed to prove it is an aggrieved party, it fails to show it has standing in this case.
Dissenting Opinion by MOON, C.J., in which LEVINSON, J., joins.
The plurality holds that Sierra Club lacks standing to challenge the failure of the Hawai`i Tourism Authority (HTA) to conduct an environmental assessment (EA), pursuant to chapter 343, otherwise known as the Hawai`i Environmental Policy Act (HEPA), prior to committing state funds to a contract for tourism marketing services. In my view, the court has misapplied the doctrine of standing by erroneously characterizing Sierra Club's asserted injury as an injury to the environment. In actuality, the asserted injury in this case is the enhanced risk that Sierra Club's plaintiff members will suffer environmental *906 harm due to HTA's failure to fulfill its alleged statutory responsibility to evaluate whether its marketing plan will have a "significant effect" on the environment. By insisting that Sierra Club demonstrate that the environment has been or will be harmed, the plurality raises the standing hurdle higher than even the showing necessary for success on the merits of Sierra Club's claim, insofar as Sierra Club need show only that: (1) HTA was required to conduct an EA; (2) HTA failed to do so; and (3) as a result, Sierra Club's plaintiff membersÔÇönot the environmentÔÇöhave been or will be harmed. Because the plurality's result is inconsistent with the language of chapter 343, federal precedent on this issue, and this court's own precedent regarding standing in the context of environmental injury, I respectfully dissent and would hold that Sierra Club had standing to initiate this action.

I. DISCUSSION

This court has long acknowledged that "[s]tanding is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he [or she] wants adjudicated." Citizens for Protection of North Kohala Coastline v. County of Hawai`i [hereinafter, Citizens], 91 Hawai`i 94, 100, 979 P.2d 1120, 1126 (1999) (quoting Life of the Land v. Land Use Commission of State of Hawaii, 63 Haw. 166, 172, 623 P.2d 431, 438 (1981)). To establish standing under both federal and Hawai`i case law, a plaintiff must show that: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; (2) the injury is "fairly traceable" to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); see also Plurality Opinion (Plurality op.). at 250, 59 P.3d at 885 (quoting Mottl v. Miyahira, 95 Hawai`i 381, 389, 23 P.3d 716, 724 (2001)); Ka Pa` akai O Ka` aina v. Land Use Comm'n, 94 Hawai`i 31, 42, 7 P.3d 1068, 1079 (2000) (quoting Citizens, 91 Hawai`i at 100, 979 P.2d at 1126). Moreover, we have recently reiterated that, "where the interests at stake are in the realm of environmental concerns, `we have not been inclined to foreclose challenges to administrative determinations through restrictive applications of standing requirements.'" Citizens, 91 Hawai`i at 100-01, 979 P.2d at 1126-27 (quoting Mahuiki v. Planning Commission, 65 Haw. 506, 512, 654 P.2d 874, 878 (1982)) (brackets and some internal quotations omitted).

A. Injury in Fact Test

It is significant that, in this case, Sierra Club challenges HTA's failure to conduct an EA pursuant to chapter 343.[1] An EA is "a written evaluation to determine whether an action may have a significant effect" on the environment. HRS  343-2.[2] Chapter 343 *907 requires state agencies to prepare an EA prior to taking any action specified in HRS  343-5(a). See HRS  343(5)(a).[3] If a proposed action "may" have a significant effect on the quality of the environment, the agency is required to prepare an environmental impact statement (EIS). See HRS  343-5(b).[4] If, on the other hand, the agency initially determines that a proposed action will not have a significant effect on environmental quality, an EIS is not required. However, before finally determining that an EIS is not required, the agency must make the draft EA available for public review and comment for a period of thirty days. See id. Thereafter, the agency must respond in writing to comments received during the public review period and prepare a final EA to determine whether an EIS is required. See id. Therefore, the provisions of chapter 343 are procedural, not substantiveÔÇöi.e., under chapter 343, the agency must consider the potential environmental consequences of its actions and allow public participation in the review process, but chapter 343 neither compels the agency to undertake, nor bars the agency from undertaking, any particular substantive action. See Kahana Sunset Owners Ass'n v. County of Maui, 86 Hawai`i 66, 72, 947 P.2d 378, 384 ("The purpose of preparing an environmental assessment is to provide the agency and any concerned member of the public with the information necessary to evaluate the potential environmental effects of a proposed action."); see also HRS  343-1 ("It is the purpose of this chapter to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations."). Accordingly, any alleged injury resulting from HTA's purported failure to follow the provisions of chapter 343 is in the nature of a "procedural" injury. In other words, the alleged injury is that the agency acts without considering potentially "significant effects" of the environmental consequences of its actions, irrespective of whether there is actual environmental harm.[5]
Although this court has not specifically addressed standing requirements in the context of a "procedural" injury,[6] a number of *908 federal courts applying the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.  4321 et. seq (1994), the federal analogue to HEPA,[7] have done so.[8] It is clear from the federal case law that, although the "procedural" nature of an alleged injury cannot eliminate the requirement that an injury be concrete and particularized, the assertion of a procedural harm requires a court to focus more precisely on the exact nature of the alleged injury.
In Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the United States Supreme Court held that the plaintiffs did not have standing to seek judicial review of a rule promulgated by the Secretary of Interior that rendered section 7 of the Endangered Species Act (ESA) applicable only to actions within the United States and on the high seas. Id. at 557-58, 578, 112 S.Ct. 2130. The basis for the Court's determination was that the plaintiffs' interest was speculativeÔÇöi.e., they did not demonstrate that the failure to extend the protections of the ESA to foreign countries would affect them because they had not established any concrete interest in the affected foreign places. See id. at 562-66, 112 S.Ct. 2130. Significantly, in the course of its analysis, the Supreme Court distinguished Lujan from cases in which the plaintiff had alleged a procedural harm. Specifically, the Court indicated that "[t]here is this much truth to the assertion that `procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Further, the Supreme Court surmised that, under its case law,
[plaintiffs] living adjacent to the site for proposed construction of a federally licensed dam [would have] standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though [the plaintiffs] could not establish with any certainty that the statement [would] cause the license to be withheld or altered, and even though the dam [would] not be completed for many years.
Id.
In light of Lujan, several federal courts have addressed standing requirements in the *909 context of a federal agency's alleged failure to comply with the procedural provisions of NEPA. In Douglas County v. Babbitt, 48 F.3d 1495 (9th Cir.1995), cert. denied, 516 U.S. 1042, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996), Douglas County sued the Secretary of the Department of the Interior for failing to comply with NEPA requirements that an EA and EIS be prepared before designating certain land as critical habitat for the Northern Spotted Owl pursuant to the Endangered Species Act of 1973, 16 U.S.C.  1533(a)(3). See id. at 1498-99. The United States Court of Appeals for the Ninth Circuit interpreted Lujan to require a plaintiff to show "two essential elements" for procedural standing: that he or she (1) is a "person who has been accorded a procedural right to protect [his or her] concrete interests and [(2)] ... has some threatened concrete interest that is the ultimate basis of [his or her] standing." Id. at 1500 (quoting Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130) (internal citations omitted). The court further noted that, in order to meet the "concrete interest" test, the plaintiff must also demonstrate a "geographic nexus" to the potential harm. See id. at 1500 n. 5. The court determined that Douglas County had been "accorded a procedural right" under the provisions of NEPA and that its proprietary interest in lands adjacent to the critical habitat represented the necessary "concrete interest." Id. at 1501. The supporting affidavit in that case alleged simply that the land management practices on federal land could affect adjacent county-owned land "[b]y failing to properly manage for insect and disease control and fire[.]" Id. Although it was uncertain whether the findings of an EIS would affect the Secretary's critical habitat designation and when the adjacent county lands would actually be harmed, the Ninth Circuit held that the County had met all of Lujan's "strict procedural standing requirements." Id.
In addition to the above, the Ninth Circuit indicated that the plaintiffs must show that their interest falls within the "zone of interests" that the challenged statute is designed to protect. Douglas County, 48 F.3d at 1499. The "zone of interests" test is derived from the fact that NEPA does not contain a provision for a private right of action; rather, persons who seek to challenge federal agency actions in federal court for violations of NEPA must do so pursuant to the federal Administrative Procedure Act (APA), 5 U.S.C.  551, et seq. (2000). See Douglas County, 48 F.3d at 1499 (citing Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) [hereinafter, National Wildlife Fed'n]. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" is entitled to judicial review. 5 U.S.C.  702 (2000). In National Wildlife Fed'n, the United States Supreme Court held that, in order to have standing to challenge, inter alia, the Secretary of the Interior's purported violations of NEPA in classifying certain publicly held lands, "the plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the `zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." National Wildlife Fed'n, 497 U.S. at 875-79, 883, 110 S.Ct. 3177 (emphasis in original). Applying this test, the Ninth Circuit in Douglas County concluded that Douglas County's claimed injury fell within the protected environment interests contemplated by NEPA. See Douglas County, 48 F.3d at 1499-1501.
Similarly, in Committee to Save the Rio Hondo v. Lucero [hereinafter, Rio Hondo], 102 F.3d 445 (10th Cir.1996), the United States Court of Appeals for the Tenth Circuit held that an environmental organization had standing to challenge the Forest Service's decision to allow summer use of a ski area in a national forest based on an alleged failure to comply with NEPA. Subsequent to discussing the significance of the procedural nature of a NEPA claim, the Tenth Circuit concluded that
the injury in fact prong of the standing test ... breaks down into two parts: (1) the litigant must show that in making its decision without following [NEPA's] procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm; and (2) the litigant must show that the increased risk of environmental *910 harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action.
Id. at 449. Using the foregoing test, the court held that the plaintiffs in Rio Hondo had sufficiently established an injury in fact. Id. at 450.
With respect to the first prong of the injury in fact test, the court held that the plaintiffs had established that they suffered an increased, threatened risk of environmental harm due to the Forest Service's alleged uninformed decision making. Id. The plaintiffs had averred that the Rio Hondo river would be affected because the summertime use of the ski area would result in increased river water consumption, sewage discharge, non-point source pollution from increased vehicle travel, and silt and industrial pollution from the ski area's mechanical operations. Id. Additionally, they had averred that the recreational and aesthetic value of the land in and around the ski area would be disturbed by increased development and mechanization. Id. The Tenth Circuit concluded that the foregoing averments were sufficient to establish that the plaintiffs had suffered a threatened increased risk of environmental harm due to the failure of the Forest Service to follow the procedures of NEPA. Id. (emphasis added).
With respect to the second prong of its injury in fact test, the Tenth Circuit held that the plaintiffs had a concrete interest because they had used the waters of the Rio Hondo watershed for their entire lifetimes for irrigation, fishing, and swimming, and they intended to continue their use. Id. Based on the foregoing analysis of the affidavits submitted by the plaintiffs, the Tenth Circuit held that the plaintiffs had demonstrated an injury in fact.[9]
Similar analyses of the procedural injury associated with the failure to follow the procedures of NEPA have been applied in other federal jurisdictions. See, e.g., Sierra Club v. Marita, 46 F.3d 606, 612 (holding that plaintiffs who used national forest had standing to challenge Forest Service's alleged failure to comply with NEPA in developing forest land and resource management plan, even though the plan was not going to be implemented immediately, because the "concrete injury underlying the procedural default" is that "environmental consequences might be overlooked"), reh'g denied, 46 F.3d 606 (7th Cir.1995); Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 666 (D.C.Cir.1996) (defining the injury in fact test to challenge the failure to perform an EIS as one in which the plaintiff "must show that the omission or insufficiency of an EIS may cause the agency to overlook the creation of a demonstrable risk not previously measurable (or the demonstrable increase of an existing risk) of serious environmental impacts that imperil [plaintiff's] particularized interest") (emphasis added); but see Sierra Club v. Robertson, 28 F.3d 753, 758 (holding that plaintiffs lacked standing to challenge the Forest Service's alleged failure to comply with NEPA in developing a general land management resources plan because, without site-specific action to challenge, the "environmental injury" was too speculative), reh'g denied, 28 F.3d 753 (8th Cir.1994).
Although no single definitive test has arisen with respect to the analysis applicable to procedural standing, it is clear that under federal law the asserted injury in a NEPA case, which is analogous to the HEPA case before us, is that there is an increased risk that environmental consequences may be overlooked as a result of deficiencies in the government's decision making process. Cf. Sierra Club v. Marsh, 872 F.2d 497, 500-01 (1st Cir.1989) ("[T]he harm consists of the added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. NEPA's object is to minimize that risk, the risk of uniformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly *911 completed project than a barely started project.") (emphasis in original).[10] However, in order to assure that the plaintiff is a proper party, the plaintiff must still demonstrate a concrete interest in or geographical nexus to the proposed action.
With these principles as a starting point, I now consider their application to HEPA. In my view, the injury asserted by Sierra Club is clearly procedural. Sierra Club challenges HTA's failure to conduct an EA prior to committing state funds to a contract for tourism marketing services. The purpose of the EA requirement, in the context of this case, is to require decision-makers to consider whether there may be a significant effect on environmental quality prior to the expenditure of money. See HRS  343-2 and 343-5(a). The failure to follow the applicable procedures increases the risk that significant environmental effects will be overlooked by the relevant decision-makers. The injuryÔÇö the increased risk of significant environmental effects due to uninformed decision makingÔÇöis precisely the type of injury that chapter 343 was designed to prevent. Additionally, however, a particular plaintiff must be among the injured. Thus, a plaintiff must not only show that disregarding the procedural requirement will result in an increased risk of environmental harm, but also that the increased risk is to the plaintiff's concrete and particularized interests.
Although this court's formulation of standing requirements has paralleled the development of standing requirements in federal law, see Akau v. Olohana Corp., 65 Haw. 383, 389, 652 P.2d 1130, 1134-35 (1982) (citing Life of the Land, 63 Haw. at 176, 623 P.2d at 441), this court had also made it clear that its own standing requirements, particularly in the realm of environmental litigation, may be less stringent than the federal requirements. See Citizens, 91 Hawai`i at 100, 979 P.2d at 1126 (noting that standing principles are governed by "prudential" considerations and that standing requisites may be tempered, or even prescribed, by legislative and constitutional declarations of policy) (citing Life of the Land, 63 Haw. at 172, 623 P.2d at 438); see also Mottl, 95 Hawai`i at 389, 23 P.3d at 724.
With respect to the legislative and constitutional declarations of policy relevant to Sierra Club's claim that the HTA failed to do an EA as required under HRS  343-5(b), article XI, section 9 of the Hawai`i Constitution states unambiguously that "[e]ach person has the right to a clean and healthful environment" and that "[a]ny person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law." Haw. Const. art. XI,  9 (1978). Moreover, the legislature has clearly declared the policy of this state with respect to the environmental review process in HRS  343-1:
The legislature finds that the quality of humanity's environment is critical to humanity's well being, that humanity's activities have broad and profound effects upon the interrelations of all components of the environment, and that an environmental review process will integrate the review of environmental concerns with existing planning processes of the State and counties and alert decision makers to significant environmental effects which may result from the implementation of certain actions. The legislature further finds that the process of reviewing environmental effects is desirable because environmental consciousness is enhanced, cooperation and coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole.

It is the purpose of [chapter 343] to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations.
*912 (Emphases added.) Furthermore, as noted earlier, HRS  343-5(b) specifically requires that members of the public be permitted to review and comment on a state agency's initial determination, in the course of developing an EA, that an EIS is not required. See supra note 4. Finally, HRS  343-7(a) explicitly provides for judicial review of an agency's failure to complete an EA:
Any judicial proceeding, the subject of which is the lack of assessment required under section 343-5, shall be initiated within one hundred twenty days of the agency's decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started. The council or office, any agency responsible for approval of the action, or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. Others, by court action, may be adjudged aggrieved.

(Emphases added.)
In the context of HRS  343-7(a), an "other" party who may be adjudged aggrieved is synonymous with a party who would have standing to challenge the failure to perform an EA because of a concrete and particularized injury fairly traceable to the defendant's failure to perform the EA and capable of redress by the court. See generally Life of the Land, Inc. v. Land Use Comm'n, 61 Haw. 3, 8, 594 P.2d 1079, 1082 (1979) (holding that plaintiff was an aggrieved party within the meaning of the Hawai`i Administrative Procedures Act (HAPA) for the purpose of challenging the Commission's reclassification of lands because plaintiff used lands in the immediate vicinity for, inter alia, aesthetic and recreational pursuits); East Diamond Head Ass'n v. Zoning Bd. of Appeals of City and County of Honolulu, 52 Haw. 518, 521-22, 479 P.2d 796, 797-98 (1971) (holding that plaintiff adjacent landowners were persons aggrieved within the meaning of HAPA for purposes of challenge to zoning variance, noting that "[t]here must be special injury or damage to one's personal or property rights as distinguished from the role of being only a champion of causes.") (internal quotations omitted); Maile Sky Court Co., Ltd. v. City and County of Honolulu, 85 Hawai`i 36, 42, 936 P.2d 672, 678 (1997) (holding that lessee bound by contract to pay property taxes was an aggrieved party for the purposes of challenging tax assessment because, "[i]n the context of real property tax laws, a person is aggrieved when that individual's pecuniary interests are or may be adversely affected") (internal quotation marks omitted). The original legislative history of HEPA, discussing judicial review of EISs, contemplated that a plaintiff would be considered an "aggrieved party" with standing only if the party had exhausted available administrative review processes by participating in a contested case hearing, as specified in HAPA. See Stand. Comm. Rep. No. 956-74, in 1974 Senate Journal, at 1126-27. A contested case is an administrative proceeding "in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." HRS  91-1(5). Inasmuch as the original legislative intent contemplated that one would have to exhaust administrative remedies through participation in a contested case hearing in order to be an aggrieved party, and agencies perform contested case hearings pursuant to some specific statutorily authorized function, it follows that, in authorizing judicial review, the legislature contemplated that an "aggrieved" party would be one whose interests fell within the "zone of interests" sought to be protected by the statute, which in this case would be the zone of interests sought to be protected by performance of an EA. In the instant case, the requirement of exhaustion of administrative remedies through participation in a "contested case hearing" is inapplicable because HTA did not hold such a hearing, nor would it be expected to do so. However, it is still logical to require that, in order to be an aggrieved party within the meaning of HRS  343-7(a), the party's alleged injury be one that HEPA was designed to protect. Cf. National Wildlife Fed'n, 497 U.S. at 879, 110 S.Ct. 3177.
Keeping in mind (1) the foregoing framework used by federal courts for analyzing NEPA claims and the knowledge that federal *913 courts have allowed similar challenges under NEPA, (2) the fact that this court may have less stringent standing requirements than do the federal courts, and (3) the foregoing constitutional and legislative policy declarations and considerations unique to Hawai`i and HEPA, the plurality's assertion that federal cases applying NEPA are inapposite to HEPA because federal law provides broader access to judicial review than HEPA, see plurality op. at 259-61 and 262-64, 59 P.3d at 894-96 and 897-99, is untenable. In its discussion of the federal law on this issue, the plurality wrongly conflates 5 U.S.C.  702, the portion of the federal Administrative Procedure Act (APA) that allows persons aggrieved by agency action to seek judicial review of that action [hereinafter, Section 702],[11] with the broad "citizen suit" provision of the ESA and other environmental legislation. Consequently, the plurality erroneously concludes that the federal decisions applying NEPA rest on so-called "citizen suit" statutory provisions and then proceeds to compare these latter provisions with the procedural rights afforded by HEPA. See, e.g., plurality op. at 258, 258 n. 24, and 261, 59 P.3d at 893, 893 n. 24, and 896. In short, the plurality is comparing apples to oranges.
The plurality acknowledges that I have correctly outlined the procedural injury framework used by federal courts to determine whether a plaintiff has stated a cognizable injury pursuant to NEPA. See Plurality op. at 259, 59 P.3d at 894. As stated earlier, NEPA, like HEPA, requires a federal agency to first conduct an EA to determine if an EIS is needed and, if so, then to conduct an EIS. See supra note 7. However, NEPA contains no statutory provisions authorizing an individual to sue if an agency violates these requirements. Rather, a person seeking judicial review of a federal agency's alleged failure to follow the provisions of NEPA must wait until the agency's entire environmental review process is final before he or she can sue pursuant to Section 702, which uniformly applies to federal agencies in the absence of other more specific federal law. See National Wildlife Fed'n, 497 U.S. at 883, 110 S.Ct. 3177. The universe of potential plaintiffs able to challenge agency actions under Section 702 is limited by several factors dictated by the express language of Section 702 and the statutory framework of the APA in which it is embedded. First, the language unambiguously requires the plaintiff to have suffered a "legal wrong" or to have been "adversely affect or aggrieved[.]" Second, a person claiming the right to sue must identify some "agency action," as defined by 5 U.S.C.  551(13),[12] that affects him or her in a specified fashion. See National Wildlife Fed'n, 497 U.S. at 882, 110 S.Ct. 3177. Whether the complained of action constitutes "agency action" is itself subject to dispute. See, e.g., id. at 885-86, 890-91, 110 S.Ct. 3177 (land classification actions by Bureau of Land Management were "agency action" with respect to one plaintiff where a specific tract of land was involved, but were not "agency action" with respect to other plaintiffs where the other plaintiffs alleged that the Bureau was embarking upon a "program" of such actions in the absence of an agency order or regulation directing the classification actions in question or agency action with respect to specific lands). Third, pursuant to 5 U.S.C.  704,[13] the agency action in question must be "final" agency action, see National Wildlife Fed'n, 497 U.S. at 882-83, 110 S.Ct. 3177, which is another legal determination subject to dispute. See, e.g., Bennett v. Spear, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (noting that, in order to be "final," the agency action must *914 (1) "mark the `consummation' of the agency's decisionmaking process" rather than be of a "merely tentative or interlocutory nature" and (2) "be one by which `rights or obligations have been determined'" or from which "`legal consequences will flow'") (internal citations omitted). Fourth, the interest that the plaintiff seeks to vindicate must also be an interest that falls within the "zone of interests" sought to be protected by the specific statute allegedly violated by the agency. See National Wildlife Fed'n, 497 U.S. at 883, 110 S.Ct. 3177. Finally, the right of judicial review pursuant to the APA is further limited by other well-developed aspects of federal case law concerning administrative procedure such as ripeness, exhaustion of administrative remedies and deference to agency primary jurisdiction.
By contrast, as noted by the plurality, the "citizen suit" provision of the ESA at issue in Lujan, 16 U.S.C.  1540(g), is not subject to the overlay of Section 702 and the other provisions of the APA. Rather, it directly confers a far broader, general right to sue for violations of the ESA:
(1) Except as provided in paragraph (2) of this subsection [dealing primarily with notice requirements] any person may commence a civil suit on his own behalfÔÇö
(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof[.]
(Emphases added.) The statute does not expressly require that the plaintiff be "legally wronged," "adversely affected," or "aggrieved." The statute does not contemplate first determining whether agency action has occurred, whether such action is final, or any of the other limitations coexistent with the APA and other principles applicable to judicial review of administrative decisionmaking. Moreover, the United States Supreme Court has held that the "zone of interests" under which the asserted injury must fall is far broader in the context of a suit brought under the citizen suit provision of the ESA than that of a suit brought under the APA. See Bennett, 520 U.S. at 162-66, 117 S.Ct. 1154. In fact, the citizen suit provision of the ESA is so broad that one of the critical issues in Lujan was whether Congress could even authorize such a broad right of action consistent with the cases and controversies requirement of Article III. See Lujan, 504 U.S. at 576-78, 112 S.Ct. 2130. As the plurality correctly points out, "[e]nvironmental statutes in the late 1960s and 1970s frequently included citizen suit provisions to recognize the interest of the public in protection of the environment, and permit `private attorneys general' to assist in implementation and enforcement." Plurality op. at 258 n. 24, 59 P.3d at 893 n. 24 (citing Sheldon, Steel Company v. Citizens for a Better Environment: Citizens Can't Get No Psychic Satisfaction, 12 Tul. Envtl. L.J. 1, 38 (1998)) [hereinafter, Sheldon]. Section 702, on the other hand, was originally enacted in 1946 as part of the APA, has remained substantially unchanged since then, see Pub.L. 79-404,  10(a), 60 Stat. 237, 243 (1946), and is limited in scope by the aforementioned principles applicable to judicial review of administrative decisions. If Congress had wanted to insert a broad citizen suit provision in NEPA when it enacted the law in 1969ÔÇöduring the same period of time it was inserting other citizen suit provisions in environmental legislationÔÇöit would have done so; significantly, it chose not to.
In short, the "citizen suit" provisions of the ESA and other environmental legislation are not analogous to Section 702 because they confer a far broader right to sue than does Section 702.[14] Therefore, the plurality, in my view, erroneously characterizes NEPA, as invoked through Section 702, as a "citizen suit" statute conferring correspondingly broad access to the courts.[15] Having wrongfully *915 equated NEPA and the APA with broad-based "citizen suit" statutes, the plurality then attempts to derogate HEPA's statutory authorization for judicial review by contrasting HEPA with these same "citizen suit" statutes rather than the more narrow provisions of NEPA upon which HEPA is based.
HRS  343-7(a) authorizes members of the public who allege a cognizable harm due to the purported failure to complete an EA to seek judicial relief. The plurality correctly points out that HRS  343-7(a) authorizes the environmental council, the office of environmental quality control, and the "applicant" for the spending project [hereinafter, collectively, named parties] to seek judicial relief from the purported failure to conduct an EA. See Plurality op. at 260-61, 59 P.3d at 895-96. As the plurality notes, the statute also authorizes "others" to sue if they are aggrieved. The plurality then claims that, in order to be aggrieved, a petitioner who is an "other" party "must satisfy substantive standing requirements." I agree. Indeed, the very issue in this case is whether Sierra Club's plaintiff members meet the substantive standing requirements necessary to qualify as "others." However, the plurality implies that the language of HRS  343-7(a) itself narrows that group of potential plaintiffs who would be "others". See Plurality op. at 263, 59 P.3d at 898 ("The language of HRS  343-7(a) expressing legislative intent to specifically describe the class of litigants who might challenge the lack of an EA is in plain contrast to the general language employed in NEPA and the APA."). The plurality is once again incorrect.
HRS  343-7(a) authorizes not only named parties, but "others" who are aggrieved, to seek judicial relief. There is no express limitation on who can qualify as an "other" party except that the purported "other" party must be aggrieved.[16] "[W]e must, in construing *916 a statute, give effect to the plain and obvious meaning of its language." State v. Savitz, 97 Hawai`i 440, 446, 39 P.3d 567, 573 (2002) (Acoba, J., dissenting) (citing Fragiao v. State, 95 Hawai`i 9, 18, 18 P.3d 871, 880 (2001) (quoting State v. Kalama, 94 Hawai`i 60, 64, 8 P.3d 1224, 1228 (2000))) (internal quotation marks and brackets omitted). Consequently the language of HRS  343-7(a) cannot be said to further restrict who can qualify as an "other" party. In this context, the meaning of the term "others" who may be "aggrieved" is analogous to a person "adversely affected or aggrieved" by agency action Section 702. Thus, the federal framework concerning standing in environmental procedural rights cases, such as the case at bar, is directly applicable to HRS  343-7(a).[17] In light of the foregoing, the right of judicial review in HEPA is not narrower than that provided by NEPA, and the procedural rights framework of federal law is clearly applicable to HEPA. Cf. Molokai Homesteaders Co-op. Ass'n, 63 Haw. at 464, 629 P.2d at 1142 (describing the "genesis" of HEPA as being "discernable" in NEPA and noting that HEPA "undoubtedly mirrors" NEPA's basic concepts).
Consistent with the analogous federal law in this area, I would formulate the injury in fact test in this case as follows. First, Sierra Club must demonstrate that HTA failed to conduct an EA before undertaking its tourism marketing plan. Second, tracking the statutory purpose of an EA, Sierra Club must demonstrate that HTA's failure to conduct the EA resulted in an increased risk that its marketing plan may have a "significant effect" on environmental quality, as defined in HRS  343-2. Third, in order to ensure that the injury is concrete and particularized, Sierra Club must show that the increased risk of a significant effect on environmental quality injures its members personally by demonstrating a "geographic nexus" between individual members and the site of the injury. Finally, Sierra Club's purported injury must be within the "zone of interests" sought to be protected by HEPA.[18] I, therefore, now address whether Sierra Club has sufficiently averred an injury in fact in this case.

1. Failure to Conduct an EA
Three plaintiff members of the Sierra Club present sufficient evidence to sustain a belief that HTA failed to conduct an EA. Margery *917 H. Freeman averred that she has relied upon environmental assessments in the past and that HTA did not complete one in regard to its marketing plan. Blake Oshiro averred that HTA did not complete an EA prior to implementing its marketing plan. David Kimo Frankel averred that he has reviewed and commented on EAs and EISs in the past to develop policy recommendations. He averred that he testified and submitted comments to HTA and received a number of public documents from HTA, including copies of the marketing plan, the request for proposals that HTA distributed, the minutes of the meeting at which HTA selected its vendor for the marketing plan, and a letter confirming HTA's selection of its vendor. In none of these documents is there a reference to an EA. The unmistakable inference from Frankel's efforts to obtain all relevant public documents is that he was attempting to obtain a copy of the EA, but that none existed. Moreover, in its written briefs to this court and at oral argument, HTA never claimed that it had performed an EA and has consistently maintained that it was not required to do so. Based on the foregoing, Sierra Club has met its present burden to establish that HTA did not conduct an EA.

2. Increased Risk That HTA's Marketing Plan May Have a Significant Effect on the Environment
Although many of the Sierra Club members' affidavits admittedly suggest a variety of generalized injuries and political grievances,[19] a closer look demonstrates that, in several instances, they have averred sufficient facts to suggest that HTA's failure to conduct an EA has caused an increased risk of a "significant effect" on environmental quality.
Frankel avers that he regularly body surfs at Makapu`u Point and Sandy Beach and regularly uses the beaches across from Kapi`olani Park, all popular visitor destinations. He avers that more visitors at these locations will decrease his opportunity to "catch waves" and decrease the space available to enjoy the beach. He further avers that he lives in Volcano, Hawai`i, a small community with vacation rentals and narrow, rustic roads lacking sidewalks upon which he frequently walks for enjoyment. He states that he regularly sees visitors in rental vehicles during his walks and that an increase in rental vehicle traffic will lead to congestion and decreased enjoyment of his walks.
Freeman avers that she lives on Kaua`i and must travel the roadways in the Lydgate Park and Po`ip;u areas in order to get to work and to conduct necessary shopping. She avers that these same roads are frequently traveled by visitors, and that she has experienced delays due to traffic congestion. She believes that more visitors will make this congestion worse. Similarly, Freeman avers that she regularly uses the beaches in these areas, that these same beaches are used by visitors, and that they are already often over-crowded such that she cannot swim without interference. She believes that additional visitors will decrease her enjoyment of the beach.
Oshiro avers that he lives in the Waikele area on O`ahu, a popular visitor shopping destination, and must use the roads in the vicinity to get to work. He also avers that he has experienced traffic delays and congestion and believes that an increased number of visitors will worsen this problem. Moreover, he maintains that he no longer visits Hanauma Bay, a popular beach and snorkeling destination, because of overcrowding attributable to visitors.
Finally, Robert Parsons avers that he resides on Maui and that his business requires frequent travel throughout the island. He states that he has experienced traffic congestion and delays, especially in the areas around resort destinations, that many of the vehicles he sees belong to visitors, and that there is no alternative route or public transportation *918 system for him to use. He avers that increasing the number of visitors on the roadways will cause further delays and more dangerous commutes.
As noted earlier, see supra note 2, HRS  343-2 defines a "significant effect" as
the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State's environmental policies or long-term environmental goals as established by law, or adversely affect the economic welfare, social welfare, or cultural practices of the community and State.
HRS  343-6(a) directs that the environmental council[20] adopt administrative rules to, inter alia, "[p]rescribe the contents of an environmental assessment." HRS  343-6(a)(9). If there is any doubt as to whether Sierra Club's averred injuries would fall within the ambit of the above definition of "significant effects," we may look to the rules promulgated by the council. See In re Water Use Permit Applications, 94 Hawai`i 97, 144, 9 P.3d 409, 456 ("[W]here an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous." (Internal quotation marks omitted.)), reconsideration denied, 94 Hawai`i 97, 9 P.3d 409 (2000). Hawai`i Administrative Rules (HAR)  11-200-12(b) states:
(b) In determining whether an action may have a significant effect on the environment, the agency shall consider every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action. In most instances, an action shall be determined to have a significant effect on the environment if it:
....
(6) Involves substantial secondary impacts, such as population changes or effects on public facilities;

. . . .
(11) Affects or is likely to suffer damage by being located in an environmentally sensitive area such as a flood plain, tsunami zone, beach, erosion-prone area, geologically hazardous land, estuary, fresh water, or coastal waters; ....
(Emphases added.) The plaintiffs' averments clearly affect "environmentally sensitive areas" such as beaches, and involve "effects on public facilities," including beaches and roads and their supporting infrastructures. It is not speculative that there is an increased risk that HTA's marketing plan may have an effect upon these public facilities.
Moreover, both Hawai`i and federal case law recognize the aesthetic and recreational interests described above as cognizable injuries. In Citizens, 91 Hawai`i 94, 979 P.2d 1120 (1999), a case involving, inter alia, Hawai`i County's failure to conduct an EA before approving a special management area permit for a development project, this court held that the plaintiff group members' interests in picnicking, swimming, boating, and gathering plants and herbs on land near the proposed development project was sufficient to constitute injury in fact. See id. at 191, 979 P.2d at 1127. In Life of the Land, we held that the plaintiffs' interest in "diving, swimming, hiking, camping, sightseeing, horseback riding, exploring and hunting" near a disputed development was a cognizable injury. See 61 Haw. at 8, 594 P.2d at 1082; see also Akau, 65 Haw. at 390, 652 P.2d at 1135 (holding that plaintiffs had standing to challenge action affecting their public right of way to the beach and characterizing the injury as a "recreational interest"); Robertson, 28 F.3d at 758 ("Complaints of environmental and aesthetic harms are sufficient to lay the basis for standing.") *919 (citing Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Given the broad language and policy directives of HEPA, I believe that the legislature intended such interests to fall under the rubric of constituting a "significant effect" on the environment and to be a cognizable injury in court.
I agree with the plurality that, at the time HTA initiated its marketing plan by selecting Hawai`i Visitors and Convention Bureau as its vendor, it was not certain that HTA's tourism marketing plan would necessarily result in the above effects. Yet the plurality's conclusion that the marketing plan might not cause an increased number of visitors coming to Hawai`i does not defeat Sierra Club's standing. The asserted injury is that there is an increased risk of significant environmental effects as a result of the failure of HTA to prepare an EA. That risk occurs when the uninformed decision is made, irrespective of whether the threatened harm will actually occur. Cf. Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1354-55 (9th Cir.1994) (holding that plaintiffs had standing in a NEPA case involving the proposed use of herbicides as part of a reforestation program, irrespective of speculation that the application of herbicides might not occur); Idaho Conservation League v. Mumma, 956 F.2d 1508, 1515 (9th Cir.1992) (holding that conservationists and environmental organizations had standing to sue the Forest Service for alleged violations of NEPA in adopting its land and resource management plan for the Idaho Panhandle Forest, notwithstanding the fact that any actual environmental consequences were "several degrees removed from the challenged action," because the plan did not propose any site-specific development and that the threat of injury was "not one but numerous steps away"). It is not speculative that spending more money on tourism marketing will result in a greater chance that more visitors will use public facilities such as beaches, parks, and roadways already commonly used by visitors, thereby leading to more congestion and less enjoyment for those frequently using these same areas. Under the broad language of HEPA, the increased risk that these effects might occur is all the plaintiffs need show. The injury cannot be said to be hypothetical or conjectural as it is allegedly already occurring.
The fact that the plurality misapprehends the nature of a procedural injury such as this one is underscored by the fact that the plurality appears to give credence to HTA's argument that the marketing plan's focus is to increase the total expenditures of visitors by increasing per visitor expenditures, rather than increasing the number of visitors. See Plurality op. at 251, 59 P.3d at 886 ("the expressed goal ... was `an average growth rate of approximately 4.6% in visitor expenditures.'") (emphasis in plurality opinion). However, consideration of the possible effects of a proposed action, rather than merely the intent of the action itself, is precisely the reason for conducting an EA. Regardless of the intent of the plan, it is reasonable to conclude that, when an agency created for the purpose of, inter alia, marketing tourism, see HRS  201B-3(16) (Supp.2000),[21] spends a great deal of money to do so, there is a greater chance that more people will visit Hawai`i. In fact, HTA's marketing plan anticipates this obvious effect. Although HTA disingenuously claims that the ultimate goal of the plan is to increase total visitor expenditures rather than the total number of visitors, the plan contemplates attaining its goal by realizing an estimated 8,000,000 visitor arrivals by 2005. See Ke Kumu: Strategic Directions for Hawaii's Visitor Industry, Appendix A at A-3 (appended to HTA's motion for summary judgment by affidavit of Robert J. Fishman, Chief Executive Officer of HTA). This is in comparison to annual visitor arrivals of six to seven million persons for each year throughout the 1990s. See Hawaii Tourism Product Assessment: Vol. I-Executive Summary, Exhibit 2-A following page 2-2 (by affidavit of Robert J. Fishman). Thus, the HTA's own studies and plans confirm the obvious: if HTA spends a lot more money marketing Hawai`i, there is a reasonable chance more people will visit. I would not ignore this unmistakable conclusion.

*920 3. Geographic Nexus
The averments discussed above establish a geographic link between a purported harm and each plaintiff. Each increased risk pertains to an area regularly used by the respective plaintiff. As such, this prong of the injury in fact test is met.

4. "Zone of Interests"
Based on the above discussion, there is no question that Sierra Club asserts injuries that fall within the range of interests that an EA was designed to protect. Accordingly, this prong of the test is met as well.

II. CONCLUSION

By insisting that Sierra Club demonstrate that the environment has been or will be harmed, rather than demonstrating the existence of an increased risk of significant environmental effects on its plaintiff members' concrete and particularized interests due to HTA's failure to conduct an EA, the plurality raises the standing hurdle higher than even the showing necessary for success on the merits of Sierra Club's claim. Such a result is inconsistent with the purpose of HEPA, inconsistent with analogous federal case law, and inconsistent with this court's own standing doctrine. Accordingly, I would hold that Sierra Club had standing to initiate this suit.[22]
NOTES
[1] HRS  201B-6 provides in pertinent part as follows:

Tourism marketing plan; measures of effectiveness.
(a) The authority shall be responsible for developing a strategic tourism marketing plan that shall be updated every three years and includes the following:
(1) Identification and evaluation of current and future tourism needs for the different regions of the State;
(2) Goals and objectives in accordance with identified needs;
(3) Statewide promotional efforts and programs;
(4) Targeted markets;
(5) Efforts to enter into brand marketing projects that make effective use of cooperative advertising programs;
(6) Measures of effectiveness for the authority's promotional programs; and
(7) Coordination of marketing plans of all destination marketing organizations receiving state funding prior to finalization of the authority's marketing plan.
[2] According to the draft TSP, the phrase "ke kumu" is a Hawaiian term and means (1) "[b]ase, foundation, basis, title (as to land), main stalk of a tree," (2) "[t]eacher, tutor, manual, primer, model, pattern," (3) "[b]eginning, source, origin," and (4) "[r]eason, cause, goal, purpose." See also M. Pukui & S. Elbert, Hawai`ian Dictionary 140, 182 (rev. ed.1986) (defining the word "ke" as "definite article, ... often translated `the'" and the word "kumu" as "[b]ottom, base, foundation, basis, title (as to land), main stalk of a tree, trunk, handle, root (in arithmetic), basis, hereditary, fundamental," (2) "[t]eacher, tutor, manual, primer, model, pattern," (3) "[b]eginning, source, origin, starting point of plaiting" and (4) "[r]eason, cause, goal, justification, motive grounds, purpose, object, why").
[3] The major market areas were identified as U.S. West (Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, Wyoming); U.S. East (all other states); Japan; Canada; Europe (France, Germany, Italy, Switzerland, and the U.K.); Latin America (Argentina, Brazil, and Mexico); other Asia (China, Hong Kong, Korea, Singapore, and Taiwan); Oceania (Australia and New Zealand); Hawai`i Convention Center; Other (all other geographical areas).
[4] The Marketing RFP excluded proposals for management of marketing services for the Meetings, Convention and Incentives (MCI) markets as well as the marketing services of the Hawai`i Convention Center. As to the "management of marketing services for the [MCI] markets," the HTA issued a request for "Proposal for Marketing Services for the [MCI] Markets" (MCI RFP) on August 20, 1999.

In a memorandum in support of the HTA's motion for summary judgment, the HTA stated that "[i]t is unclear as to whether Petitioner is challenging the Respondents' expenditure of state funds for only the Marketing RFP or also for the MCI RFP." However, the petition states that Petitioner challenges the HTA's action "in approving the expenditure of $114 million of state funds ... for advertising and marketing services ... without first preparing an [EA.]" The contract term for the MCI RFP was "a minimum of 3 years with an option to renew" and the project budget was "approximately $6 million" annually.
In its memorandum in opposition to the HTA's motion for summary judgment, Petitioner stated that the MCI RFP "[is] not the express subject[] of this lawsuit, although [it] certainly could be." Thus, while not specifically indicated, it is clear that Petitioner challenges the Marketing RFP, and, therefore, we do not consider the MCI RFP in this case.
[5] As to the 4.6% annual growth in visitor expenditures, the Draft TSP states as follows:

The HTA[ ] seeks to manage the growth of tourism's contribution to Hawai`i's economy by targeting an average annual uninflated growth of 4.6 percent in visitor expenditures through 2005. Visitor expenditures are a product of three variables: 1) visitor expenditures per person per day; 2) length of stay; and 3) the number of visitor arrivals. The HTA's focus will be on better utilization of existing facilities, value-added visitor products and experiences, and increasing yield.... The HTA seeks to manage the growth of tourism's contribution to Hawai`i's economy by targeting an average annual uninflated growth of 4.6 percent in visitor expenditures through 2005 (2.7 percent real growth after adjusting for inflation). This moderate rate of growth is lower than the growth experienced historically and would boost Hawai`i's overall economy by approximately 0.7 percent. Modest growth in Hawai`i's visitor industry will provide additional resources, and help leverage economic diversification initiatives of the state.
(Emphases added.)
[6] HRS  201B-12(b) provides, with respect to exemption of the HTA from taxation and the Hawai`i public procurement code that

[t]he [HTA] shall not be subject to chapter 103D and any and all other requirements of law for competitive bidding for project agreements, construction contracts, lease and sublease agreements, or other contracts unless a project agreement with respect to a project otherwise shall require.
[7] HRS  201B-15 provides for original jurisdiction of particular actions in this court as follows:

Any action or proceeding to which the [HTA], the State, or the county may be a party, in which any question arises as to the validity of this chapter, shall be preferred over all other civil cases, except election cases, in any court of this State and shall be heard and determined in preference to all other civil cases pending therein except election cases, irrespective of position on the calendar. The same preference shall be granted upon application of counsel to the authority in any action or proceeding questioning the validity of this chapter in which the authority may be allowed to intervene. In addition to the preference provided in this section, any action or proceeding to which the authority, the State, or the county may be party, in which any question arises as to the validity of this chapter or any portion of this chapter, or any action of the authority may be filed in the supreme court of the State, which court is hereby vested with original jurisdiction over the action. Notwithstanding any provision of law to the contrary, declaratory relief from the supreme court may be obtained for any action.
(Emphases added.)
[8] HRS  201B-15 was amended in the 2001 legislative session, after this case was heard in oral argument, removing original jurisdiction in the Supreme Court and vesting it in the circuit court of the circuit where the case or controversy arose. See 2001 Haw. Sess. L. Act 251,  1 at 648.
[9] Although the contract states a payment amount of $117 million, all the subsequent motions and documents filed by the parties indicate the amount as $114 million.
[10] HRS  343-5(a)(1) provides as follows:

Applicability and requirements. (a) Except as otherwise provided, an environmental assessment shall be required for actions which:
(1) Propose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects which the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies[.]
(Boldfaced font in original) (emphasis added.) The term "`[a]ction' means any program or project to be initiated by any agency or applicant." HRS  343-2 (Supp.2000). While we do not consider the merits of the parties' arguments in this case, we note that the language of HRS  343-5(a)(1), literally read, appears to require that an environmental assessment be made for any use of state or county funds, unless the statute is clarified by the legislature.
The concurrence's limiting of the applicability of HRS  343-5(a)(1) to land related matters is too narrow. That section expressly requires an environmental assessment for actions which "[p]ropose the use of state or county lands or the use of state or county funds." Id. (emphasis added). This language clearly indicates that HRS  343-5(a)(1) applies to more than just land related matters.
[11] The HTA's motion for summary judgment maintained: (1) that HRS chapter 343 triggers environmental reviews only for "projects" and "programs" involving site-specific developments and that to interpret "program" more broadly would lead to an absurd result because EAs would then be required for everything; (2) that the State Environmental Council and Office of Environmental Quality Control have applied chapter 343 to only site-specific developments; (3) that amendments to chapter 343 reflect a legislative intent that an environmental review be limited to site-specific developments; (4) that the expenditure of state funds to promote tourism is not an agency action but, rather, a legislative action; (5) that the marketing campaign's goal is to increase visitor expenditures, rather than the number of visitors; (6) that an environmental review of the tourism marketing campaign would have no useful decision-making function and would not pass the test of reasonableness; and (7) that the court lacks jurisdiction to resolve a political question as to whether the "triggering" action should be extended to include all expenditures of state or county funds.
[12] The HTA also argued the following: (1) that Petitioner is not entitled to injunctive relief because HRS  201B-15 was never intended to be used for injunctive relief; (2) that the circumstances in this case do not justify injunctive relief; (3) that an environmental review under chapter 343 is not triggered by its tourism marketing plan or marketing contracts; (4) that the HTA complied with all applicable laws prior to soliciting a contractor to implement its tourism strategic plan; (5) that Petitioner's action is barred by the running of the statute of limitations in HRS chapter 343; (6) that laches bars Petitioner from receiving injunctive relief; (7) that Petitioner's assumptions on the increased number of visitors caused by the tourism marketing plan are not based on undisputed facts; and (8) that the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.  4321 et seq., cannot provide guidance for interpreting "programs" under chapter 343. In addition, in its answer to the petition, the HTA alternatively denied it was an agency.
[13] In the quote, the term "wrongful" before the word "conduct" is deleted. In some circumstances, the wrongfulness of the conduct may be apparent. The nature of the conduct involved, however, ultimately rests on the determination of standing, and therefore in the formulation of the injury-in-fact test the initial characterization of the conduct as "wrongful" is unnecessary and may be misleading.
[14] The concurrence would require a prospective plaintiff to prove "a `geographic nexus' to [] lands [designated by HRS  343-5(a)] in order to establish a concrete interest." See concurring opinion at 268, 59 P.3d at 903. However, this requirement is essentially encompassed in the injury-in-fact testÔÇöthe first two prongs of which require that (1) "the plaintiff [has] suffered an actual or threatened injury as a result of the defendant's ... conduct" and (2) "the injury [be] fairly traceable to the defendant's actions[.]" See discussion and cases cited at Part III, supra.
[15] The dissent misstates this proposition, asserting that it is "insist[ed] that Sierra Club demonstrate that the environment has been or will be harmed[,]" rather than that "Sierra Club's plaintiff membersÔÇönot the environmentÔÇöhave been or will be harmed." Dissenting opinion at 1 (emphases in original). In fact, Petitioner's claim rest on the fact that perceived harm to the environment will affect their interests in and use of the land, air, and water probably affected. Thus, it is their specific claim of harm to the environment that is evaluated.
[16] The concurrence's contention that, under this opinion, Sierra Club "would have to wait until its concrete interests were injured by the completion or near completion of the marketing plan[,]" is mistaken. Concurring opinion at 268, 59 P.3d at 903. The cases we have cited hold to the contrary. See discussion and cited cases in Part III, supra. For instance, as to the first prong of establishing the injury-in-fact test, the plaintiff need only show it "has ... suffered an actual or threatened injury as a result of the defendant's... conduct[.]" Mottl, 95 Hawai`i at 389, 23 P.3d at 724 (internal quotation marks and citations omitted) (emphasis added). Hence, we do not hold that Sierra Club was required to "wait until its concrete interests were injured by the completion or near completion of the marketing plan[,]" but that they show the threat thereof met the three-part test.
[17] The HTA stated that it did not have "knowledge or information sufficient to form a belief as to the truth or falsity" of the first three statements and denied the fourth allegation.
[18] The footnote states that "Longwoods International prepared an independent study for HVCB establishing that $10 million spent on emergency advertising in 1997 brought to Hawai`i an additional 890,000 visitors in 1998 and 1999."
[19] "[A] motion for summary judgment may be decided only on the basis of admissible evidence." Takaki v. Allied Machinery Corp., 87 Hawai`i 57, 69, 951 P.2d 507, 519 (App.1998) (citing Munoz v. Yuen, 66 Haw. 603, 605, 670 P.2d 825, 826 (1983) (per curiam)); see also Blair v. Ing, 95 Hawai`i 247, 270 n. 19, 21 P.3d 452, 475 n. 19 (2001) ("Inadmissible evidence cannot create a genuine issue of material fact."); Keka, 94 Hawai`i at 222-23, 11 P.3d at 10-11 (2000) (holding that "the circuit court erred in relying upon [inadmissible evidence] in granting summary judgment in [plaintiff]'s favor"). While the press release itself was authenticated by a member of Petitioner, see Nakato v. Macharg, 89 Hawai`i 79, 88, 969 P.2d 824, 833 (App.1998) (holding that, to be admissible, documents submitted in support of a summary judgment motion must be authenticated by and attached to an affidavit that meets the requirements of applicable rule of procedure, and the affiant must be a person through whom the exhibits could be admitted into evidence), the references to the Longwoods Study in the press release are inadmissible hearsay. See Hawai`i Rules of Evidence (HRE) Rule 801(3) ("`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); HRE Rule 802 ("Hearsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawai`i supreme court, or by statute.").
[20] The Longwoods Study, as far as related by Petitioner, did not suggest what, if any, adverse impact on the environmental interests identified by Petitioner occurred as a result of the increased arrivals.
[21] We note that according to the Marketing RFP, the marketing contract is subject to termination because of "non performance," a "change in the administration," "funding," or "the convenience of the state." Expenditures under the contract, then, are subject to further contingenciesÔÇöin this instance, legal contingencies during its term.
[22] What we construe as Petitioner's "procedural standing" argument is found within its Memorandum in Support of Motion for Summary Judgment. In entirety, it states as follows:

3. Injury from Increased Likelihood of an Erroneous Decision
Finally, injury has occurred because without an EA the likelihood of environmental harm being caused by the project has been unreasonably increased. The federal First Circuit Court ruled that if, due to procedural violations of NEPA, agency decision-makers are not adequately informed as to the nature and extent of environmental impacts, "real environmental harm will occur through inadequate foresight and deliberation." Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir.1989).
Like NEPA, HEPA is largely a procedural statute which requires disclosure of environmental impacts prior to the undertaking of a project. HEPA "simply ensures agency consideration of environmental concerns before a decision is rendered." (Emphasis added.) Pearl Ridge, supra.
Petitioner also states in a footnote to this section, "These arguments are without prejudice to the claim that the private environmental right of action in Article XI,  9 of the State of Hawai`i has eliminated all standing requirements."
[23] See supra note 12.
[24] "Citizen suit" provisions in federal environmental statutes are broadly worded provisions that, on their face, would allow anyone to challenge agency actions. As noted by one commentator, "[e]nvironmental statutes in the late 1960s and 1970s frequently included citizen suit provisions to recognize the interest of the public in protection of the environment, and permit `private attorneys general' to assist in implementation and enforcement." Karin P. Sheldon, Steel Company v. Citizens for a Better Environment: Citizens Can't Get No Psychic Satisfaction, 12 Tul. Envtl. L.J. 1, 38 (1998).

Prior to 1970, standing had rarely been an issue, and courts routinely relied upon Congressional determinations of who had standing to sue based upon statutes conferring judicial review, such as citizen suit provisions. Brian J. Gatchel, Informational and Procedural Standing after Lujan v. Defenders of Wildlife, 11 J. Land Use & Envtl. L. 75, 78 (1995). Thus, citizen suit provisions, such as those within the APA, set the threshold as to which plaintiffs could bring their suits to court, irrespective of whether there was any injury alleged. See id.
[25] The dissent mischaracterizes our forgoing statement as "[t]he plurality acknowledges that [the dissent] have correctly outlined the procedural injury framework used by federal courts to determine whether a plaintiff has stated a cognizable injury pursuant to NEPA." Dissenting opinion at 278, 59 P.3d at 913. We are not "acknowledg[ing]" the dissent's outline of the procedural injury framework, but are simply setting forth the procedural standing requirements in federal court to give context to our discussion.
[26] The dissent applies the "zone of interests" test to Petitioner's claim under HRS  343-7(a) in error.

The APA provides a right to judicial review only when "`there is no other adequate remedy at court,' 5 U.S.C.  704, and applies universally `except to the extent thatÔÇö(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law,'  701(a)." Bennett v. Spear, 520 U.S. at 175, 117 S.Ct. 1154. Thus, the "zone of interests" test has been applied to challenges under the other statutes using the APA as a method of obtaining judicial review. See Clarke, Comptroller of the Currency v. Securities Industry Ass'n, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ("The principal cases in which the `zone of interest' test has been applied are those involving claims under the APA, and the test is most usefully understood as a gloss on the meaning of  702."); Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Ass'n of Data Processing Serv. Orgs. Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Douglas County, supra; Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1354 (9th Cir.1994); Yesler Terrace Community Council v. Cisneros, 37 F.3d 442, 445 (9th Cir.1994).
The federal case law, then, indicates that the "zone of interests" test is applicable when (1) a plaintiff seeks to challenge an agency violation of an underlying statute using the APA, and (2) the APA is not available when the underlying statute provides an "adequate remedy at court." However, the dissent argues the "zone of interests" test applies absent a claim under Hawai`i Administrative Procedures Act, HRS  chapter 91. Because the scope of review of the APA is so broad, the dissent's use of this test when neither the APA nor HAPA are invoked is questionable at best.
Moreover, the dissent extends the scope of the zone of interests test to include "interests" within, not only the specific statutory provision at issue, but the entire scope of chapter 343, as well as an assortment of other constitutional and statutory provisions. Accordingly, the dissent does not adhere to the mandates of the test, itself. In Bennett v. Spear, supra, the U.S. Supreme Court instructed that the test is to be narrowly construed with reference to the underlying statute:
Whether a plaintiff's interest is "arguably . . . protected . . . by the statute" within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies. . . . In Data Processing itself, for example, we did not require that the plaintiffs' suit vindicate the overall purpose of the Bank Service Corporation Act of 1962, but found it sufficient that their commercial interest was sought to be protected by the anti-competition limitation contained in  4 of the ActÔÇöthe specific provision which they alleged had been violated. As we said with the utmost clarity in National Wildlife Federation, "the plaintiff must establish that the injury he complains of ... falls within the `zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."
Id. at 175-76, 90 S.Ct. 827 (internal citations omitted) (emphases added).
In the instant case, the provision Petitioner claims is the legal basis for its complaint is HRS  343-5(b). The dissent, however, cites to the overall purposes of the EA requirement, see dissenting opinion at 276-77, 59 P.3d at 911-12 (citing HRS  343-1, -2, -5(a), and -7(a)), and the Hawai`i Constitution, see dissenting opinion at 276, 59 P.3d at 911 (citing Haw. Const. art. XI.,  9), and the legislative history of HRS  343-7, see id. at 277-78, 59 P.3d at 912-13. Even assuming that the zone of interests test applies, which, as indicated supra, it does not, this shotgun approach using scattered provisions defeats the purpose of such a test.
[27] The concurrence makes an anomalous distinction between the so-called "procedure standing" and "substantive standing." As indicated infra, the so-called "procedural standing" is a limited federal doctrine implied from general language in federal statutes lacking the specificity set forth in HRS  345-5. Thus, case law stemming from such a doctrine is not relevant to our own detailed statute.
[28] The Court stated that:

There is much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.
Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130 (emphasis added).
[29] A majority of the Eighth Circuit relied on the citizen-suit provisions of both the ESA and the APA, both of which were invoked by Defenders of Wildlife. See Defenders of Wildlife v. Hodel, 851 F.2d 1035, 1039 (8th Cir.1988). As to "section 702 of the Administrative Procedure Act (APA), 5 U.S.C.  702 (Supp. II 1982), which provides that persons `adversely affected or aggrieved by agency action within the meaning of a relevant statute' may bring suit to challenge a final agency action," the Eighth Circuit held that "plaintiffs must show that `the challenged action[] caused them "injury in fact," and that the alleged injury was to an interest "arguably within the zone of interests to be protected or regulated" by the statutes that the agencies were claimed to have violated.' Sierra Club v. Morton, 405 U.S. at 733, 92 S.Ct. 1361." Id. at 1039 n. 2. The court concluded that a procedural injury may be a cognizable injury in fact. See id. at 1039-41. After concluding that Defenders had pleaded a procedural harm, the court applied traditional injury-in-fact test, finding that Defenders had standing. See id. at 1041-44.

On remand, the Secretary again moved for summary judgment on the standing issue, which the district court denied, relying upon the Eighth Circuit's ruling that Defenders had standing. See id. (citing Defenders of Wildlife v. Hodel, 707 F.Supp. 1082 (D.Minn.1989)). On appeal, the Eighth Circuit affirmed, see id. (citing Defenders of Wildlife v. Lujan, 911 F.2d 117 (8th Cir.1990)), and the United States Supreme Court granted certiorari, see id.
[30] HRS  343-2 (1993) defines "council" as "the environmental council." The "office" is defined as "the office of environmental quality control." Id. The office of environmental quality control "serve[s] the governor in an advisory capacity on all matters relating to environmental quality control." HRS  341-3(a). The council, as appointees of the governor, see HRS  341-3(c), "shall serve as a liaison between the director [of the office of environmental quality control] and the general public by soliciting information, opinions, complaints, recommendations, and advice concerning ecology and environmental quality through public hearings or any other means and by publicizing such matters as requested by the director[.]" HRS  341-6. Additionally, as noted in HRS  341-6, "[t]he council shall monitor the progress of state, county, and federal agencies in achieving the State's environmental goals and policies[.]" Thus, both the council and the office of environmental quality and control serve as a link between the public and the governor, and monitor state agencies for compliance with environmental policies.
[31] The language within HRS  343-7(a) is unique. We observe that there is no state or federal statute using the phrase "[o]thers, by court action, may be adjudged aggrieved[,]" HRS  343-7(a), nor any substantially similar permutation of that phrase.
[32] The dissent, however, focuses on the word "aggrieved," and, disregarding the plain distinction within HRS  343-7(a), applies the unrestricted HAPA language, "[a]ny person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof[.]" HRS  91-14. Although the dissent does not acknowledge the limitations on judicial review in HRS  343-7(a), we observe that, had the legislature desired that this court interpret judicial review under HRS  343-7(a) as broadly as that under HRS  91-14, or any citizen suit provision upon which the dissent relies, it would surely have used the same language.
[33] In Bennett v. Spear, supra, the United States Supreme Court noted how broad this language is:

The first operative portion of the provision says that "any person may commence a civil suit"ÔÇö an authorization of remarkable breadth when compared with the language Congress ordinarily uses. Even in some other environmental statutes, Congress has used more restrictive formulations, such as "[any person] having an interest which is or may be adversely affected," 33 U.S.C.  1365(g) (Clean Water Act); see also 30 U.S.C.  1270(a) (Surface Mining Control and Reclamation Act) (same); "any person suffering legal wrong," 15 U.S.C.  797(b)(5) (Energy Supply and Environmental Coordination Act); or "any person having a valid legal interest which is or may be adversely affected ... whenever such action constitutes a case or controversy," 42 U.S.C.  9124(a) (Ocean Thermal Energy Conversion Act). And in contexts other than the environment, Congress has often been even more restrictive. In statutes concerning unfair trade practices and other commercial matters, for example, it has authorized suit only by "any person injured in his business or property," 7 U.S.C.  2305(c); see also 15 U.S.C.  72 (same), or only by "competitors, customers, or subsequent purchasers,"  298(b). 520 U.S. at 164-65, 117 S.Ct. 1154. Unlike the authorization in the ESA, HRS  343-7(a) is specific.
[34] HRS  91-1 defines "rule" as "each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include ... intra agency memoranda."
[35] In light of the fact that we have decided that Petitioner lacks standing, we do not reach the merits of the case.
[1] HRS  343-7(a) provides:

(a) Any judicial proceeding, the subject of which is the lack of assessment required under section 343-5, shall be initiated within one hundred twenty days of the agency's decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started. The council or office, any agency responsible for approval of the action, or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. Others, by court action, may be adjudged aggrieved.
(Emphasis added.)
[2] In Douglas County, the plaintiff sued the Secretary of Interior for failing to comply with the National Environmental Policy Act (NEPA) when the Secretary concluded an EA, and consequently EIS, need not be prepared for the designation of lands as critical habitat. Douglas County, 48 F.3d at 1498. The Secretary challenged the plaintiff's standing. Id. at 1499. The Ninth Circuit conferred standing on the plaintiffs because, among other things, NEPA provided that "`local agencies, which are authorized to develop and enforce environmental standards' may comment on the proposed federal action." Id. at 1501 (quoting 42 U.S.C.  4332(2)(C)). The court construed Douglas County as such an agency because an Oregon Statute authorized counties to "`[p]repare, adopt, amend, and revise' land management plans that contain environmental standards." Douglas County, 48 F.3d at 1501 (quoting Or.Rev.Stat.  197.175 (1993)). Douglas County constituted a local agency because an Oregon statute allowed counties to "`[p]repare, adopt, amend, and revise' land management plans that contain environmental standards." Douglas County, 48 F.3d at 1501 (quoting Or. Rev.Stat.  197.175 (1993)). The Douglas County court also held that the plaintiff established it had a concrete interest because the lands at issue were adjacent to the county. Douglas County, 48 F.3d at 1501.
[3] I differentiate between "substantive standing" and "procedural standing." For purposes of this opinion, I refer to the injury in fact standing test as "substantive standing" and the standing test enunciated in Lujan as procedural standing.
[4] An EIS is an "informational document prepared in compliance with the rules ... [that] discloses the environmental effects of a proposed action...." HRS  343-2.
[5] The procedural standing test requires:

(1) that he or she is a "person who has been accorded a procedural right to protect [his or her] concrete interests. ..." Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130 and (2) that the plaintiff has "some threatened concrete interest... that is the ultimate basis of [his or her] standing." Lujan, 504 U.S. at 573 n. 8, 112 S.Ct. 2130, see also Douglas County, 810 F.Supp. [1470,] 1477 [(D. Oregon 1992)].
Douglas County, 48 F.3d at 1500 (quoting Lujan, 504 U.S. at 573 n. 8, 112 S.Ct. 2130) (footnotes omitted) (emphasis added).
[6] The Scientists' Inst. for Public Info., Inc. court specifically stated that:

The basic thrust of NEPA is to require consideration of environmental effects of proposed agency action long enough before that action is taken so that important agency decisions can meaningfully reflect environmental concerns. In the context of a long-range program such as involved here, judicial review of compliance with NEPA is necessary at stages at which significant resources are being committed, lest the statute's basic purpose be thwarted.
Scientists' Inst. for Public Info., Inc., 481 F.2d at 1086 n. 29.
[7] HRS  343-5 provides in relevant part:

(a) Except as otherwise provided, an environmental assessment shall be required for actions which:
(1) Propose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects which the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies;
(2) Propose any use within any land classified as conservation district by the state land use commission under chapter 205;
(3) Propose any use within the shoreline area as defined in section 205A-41;
(4) Propose any use within any historic site as designated in the National Register or Hawaii Register as provided for in the Historic Preservation Act of 1966, Public Law 89-665, or chapter 6E;
(5) Propose any use within the Waikiki area of Oahu, the boundaries of which are delineated in the land use ordinance as amended, establishing the "Waikiki Special District";
(6) Propose any amendments to existing county general plans where such amendment would result in designations other than agriculture, conservation, or preservation, except actions proposing any new county general plan or amendments to any existing county general plan initiated by a county;
(7) Propose any reclassification of any land classified as conservation district by the state land use commission under chapter 205; and
[(8)] Propose the construction of new, or the expansion or modification of existing helicopter facilities within the state which by way of their activities may affect any land classified as conservation district by the state land use commission under chapter 205; the shoreline area as defined in section 205A-41; or, any historic site as designated in the National Register or Hawaii Register as provided for in the Historic Preservation Act of 1966, Public Law 89-665, or chapter 6E; or, until the statewide historic places inventory is completed, any historic site found by a field reconnaissance of the area affected by the helicopter facility and which is under consideration for placement on the National Register or the Hawaii Register of Historic Places.
[1] An organization may sue on behalf of its members even though it has not been injured itself when: (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief itself requested requires the participation of individual members in the lawsuit. See Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); see also Aged Hawaiians v. Hawaiian Homes Comm'n, 78 Hawai`i 192, 204-05, 891 P.2d 279, 291-92 (Association had standing on behalf of its members to challenge land awards made by defendant because "it can reasonably be supposed that the [sought after] remedy, if granted, will inure to the benefit of those members of the association actually injured." (Citing Hunt, 432 U.S. at 343, 97 S.Ct. 2434.) (Internal quotations omitted.)), cert. denied, 516 U.S. 819, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995). In this case, both of the latter two requirements are clearly met and the first requirement is the only requirement at issue: whether the individual members of Sierra Club who have filed affidavits would have standing in their own right.
[2] HRS  343-2 also states that:

"Significant effect" means the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State's environmental policies or long-term environmental goals as established by law, or adversely affect the economic welfare, social welfare, or cultural practices of the community and State.
[3] HRS  343-5(a)(1) states in relevant part:

Except as otherwise provided, an environmental assessment shall be required for actions which[] ... [p]ropose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects which the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property[.]
[4] HRS  343-5(b) states in relevant part:

Whenever an agency proposes an action in subsection (a), other than feasibility or planning studies for possible future programs or projects which the agency has not approved, adopted, or funded, or other than the use of state or county funds for the acquisition of unimproved real property, which is not a specific type of action declared exempt under section 343-6, that agency shall prepare an environmental assessment for such action at the earliest practicable time to determine whether an environmental impact statement shall be required. For environmental assessments for which a finding of no significant impact is anticipated, a draft environmental assessment shall be made available for public review and comment for a period of thirty days. The office shall inform the public of the availability of the draft environmental assessment for public review and comments pursuant to section 343-3. The agency shall respond in writing to comments received during the review and prepare a final environmental assessment to determine whether an environmental impact statement shall be required. A statement shall be required if the agency finds that the proposed action may have a significant effect on the environment.
[5] The plurality, noting that there is scant briefing on the topic of procedural standing and characterizing the dissent as having "seized upon" the topic, appears to suggest that somehow it is improper to do so. See Plurality op. at 257, 59 P.3d at 892. As the plurality understands, this court has a duty to consider, sua sponte, whether the petitioner before it has standing. Akinaka v. Disciplinary Board, 91 Hawai`i 51, 55, 979 P.2d 1077, 1081 (1999). In the absence of standing, "we are without jurisdiction to consider" the case before us. State v. Moniz, 69 Haw. 370, 373, 742 P.2d 373, 376 (1987). Accordingly, although none of the parties in this case addressed the general issue of standing with any substantial depth, the significance of the standing issue is apparent and is illustrated by the depth in which the plurality itself addresses this topic.
[6] This court has previously confronted allegations involving the failure to complete an EA, but has not had occasion to address this issue as a "procedural" injury, most likely because the plaintiffs' geographic proximity to the site of the injury was so close as to make the concrete injury obvious without further consideration. See Citizens, 91 Hawai`i at 101, 979 P.2d at 1127 (site of plaintiffs purported injury within "dozens of feet" of development project); Kahana Sunset Owners Ass'n, 86 Hawai`i at 68 & n. 1, 947 P.2d at 380 & n. 1 (challenge to proposed development located near plaintiffs); Pearl Ridge Estates Community Ass'n v. Lear Siegler, Inc., 65 Haw. 133, 136-37, 648 P.2d 702, 704 (1982) (Nakamura, J., concurring) (challenge to Land Use Commission's reclassification of land located near plaintiffs). In the latter two cases, we did not even address the issue of standing.
[7] Under federal law, regulations implementing NEPA require agencies to first conduct an "environmental assessment" to determine whether an environmental impact statement is needed, unless existing law or regulations have already determined the need for an environmental impact statement. See 40 C.F.R.  1501.3, 1501.4, 1507.3, and 1508.9 (2000). An environmental impact statement is needed if an agency proposes legislation or contemplates "major Federal actions significantly affecting the quality of the human environment[.]" See 42 U.S.C.  4332(2)(C). Chapter 343, which provides for similar procedures for the development and publication of information on environmental decisions, and Chapter 344, which established a general policy on environmental protection, "undoubtedly mirror[] NEPA's basic concepts." Molokai Homesteaders Co-op. Ass'n v. Cobb, 63 Haw. 453, 464, 629 P.2d 1134, 1142 (1981); see also 1974 Senate Journal at 647-48 (Floor Speech of Senator Rohlfing describing Hawai`i legislation involving chapter 343 as one of NEPA's state progeny).
[8] This court has looked to federal case law as persuasive authority for standing requisites. See, e.g., Life of the Land v. Land Use Commission, 63 Haw. 166, 173, 623 P.2d 431, 439 (1981) ("Although Supreme Court doctrine on this issue does not bind us, we have, on occasion, sought guidance therefrom."); Reliable Collection Agency, Ltd. v. Cole, 59 Haw. 503, 510-11, 584 P.2d 107, 111 (1978) ("While we are not subject to the `case or controversy' requirement of Article III of the United States Constitution, the prudential considerations which have been suggested in the federal cases on standing persuade us that a party should not be permitted to assume the role and responsibility of a public official to enforce public law without a personal interest which will be measurably affected by the outcome of the case.").
[9] The Tenth Circuit also held that the plaintiffs' "recreational, aesthetic, and consumptive interests in the land and water" fell within the "zone of interests" that NEPA was designed to protect. Rio Hondo, 102 F.3d at 448.
[10] The foregoing description of the harm associated with a violation of NEPA's environmental review provisions was made in the context of assessing whether the district court properly denied the plaintiffs' request for a preliminary injunction rather than in determining whether the plaintiffs had standing. See Sierra Club, 872 F.2d at 499. Nevertheless, the description is equally compelling in the context of the present case.
[11] As noted earlier, the relevant portion of Section 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."
[12] 5 U.S.C.  551(13) defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]"
[13] 5 U.S.C.  704 provides, in relevant part:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.
[14] Other citizen suit legislation similarly uses the "any person" language of the ESA. See, e.g., Toxic Substances Control Act, 15 U.S.C.  2619 (1997); Surface Mining Control and Reclamation Act, 30 U.S.C.  1270 (1997); Clean Water Act, 33 U.S.C.  1365 (1988); Resource Conservation and Recovery Act, 42 U.S.C.  6972(a) (1997); Clean Air Act, 42 U.S.C.  7604 (1997).
[15] The plurality's error may stem from a misreading of comments by Professor Sheldon in the aforementioned article which discusses recent Supreme Court jurisprudence that utilizes standing doctrine to limit access to federal courts under the "citizen suit" provisions of environmental legislation. See Sheldon, supra. Discussing the relatively liberal access permitted to federal courts in the 1960s and 1970s as a backdrop to the current situation, Professor Sheldon writes that:

Cases involving citizen suits and other statutory grants of standing were brought with equal ease. The [APA] includes an extremely broad grant of standing. Under [Section 702], "a person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The APA has allowed citizen standing in a wide variety of cases, especially under [NEPA].
Id. at 29 (footnotes omitted). Professor Sheldon's primary goal in this portion of her article was to describe the generally liberal access to federal courts that was permitted during the 1960s and 1970s, in contrast to the current situation. NEPA, via the APA, certainly was-and remains-one of the mechanisms by which plaintiffs obtained access to the courts. By virtue of the fact that it created an across-the-board environmental review process in the first place, NEPA undoubtedly significantly increased access to federal courts, relative to the situation that existed previously, to address many environmental issues. Nonetheless, Professor Sheldon's description of citizen suit and NEPA cases as being "brought with equal ease" appears to be a bit hyperbolic because the access authorized by the statutory provisions of NEPA and the APA is demonstrably not "equal" to the access authorized by the citizen suit provisions of ESA and other environmental statutes. If Professor Sheldon's article were a judicial opinion, I would term the language in this portion of her work "dictum." Significantly, none of the cases cited by Professor Sheldon for the proposition that "[t]he APA has allowed citizen standing in a wide variety of cases, especially under [NEPA][,]" equates NEPA with "citizen suit" legislation. See id. at 29 n. 223 (citing Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n, 449 F.2d 1109 (D.C.Cir.1971); Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); National Wildlife Fed'n, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).
[16] Moreover, HRS  343-7 contains additional provisions for direct judicial review of the alleged failure to conduct other portions of the review process mandated by HEPA. While HRS  343-7(a) provides for judicial review of the alleged failure to perform an EA, HRS  343-7(b) provides for judicial review of the decision whether to perform an EIS, and HRS  343-7(c) provides for judicial review of the decision to accept or reject an EIS. These statutes authorize judicial review at earlier stages of the environmental review process than NEPA and authorize review more frequently throughout the process than NEPA. It would be incongruous to increase the range of environmental review procedures that are subject to judicial review and, at the same time, restrict the circle of potential persons for whom review is available. This is particularly true when the entire purpose of the review process at the stages upon which judicial review is authorized by HEPA is to expand public input. See, e.g., supra at 4 (describing the requirement that, when an agency conducts an EA and determines that an EIS is not required, it must make its draft EA available for public review and comment, respond in writing to the comment, and prepare a final EA).
[17] It is for this reason that I would adopt the additional "zone of interests" test to determine whether an "other" party has standing (or is aggrieved) pursuant to HRS  343-7(a) when the "other" party is challenging government action for which there was no opportunity to participate in a contested case hearing. As with the analogous federal law, use of the "zone of interest" test under these circumstances limits, rather than expands (as the plurality wrongly concludes, see plurality op. at ___-___ n. 26, 59 P.3d at 894-95 n. 26), the potential universe of "other" parties. Under the "zone of interests" test, the concrete, cognizable injury asserted by a litigant who challenges the purported failure to complete an EA pursuant to HRS  343-7(a) must also be an injury that was meant to be protected by the performance of an EA in the first place. Rather than being a "shotgun approach using scattered provisions" of the HEPA, see id., I submit that my approach is simply common sense.
[18] The party invoking jurisdiction bears the burden of establishing these elements. Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. See Lujan, 504 U.S. at 561, 112 S.Ct. 2130. If this were the pleading stage, for example, general factual allegations of injury resulting from HTA's conduct would suffice; for on a motion to dismiss we accept the allegations "as true and construe [them] in the light most favorable to the plaintiff." Casumpang v. ILWU, Local 142, 94 Hawai`i 330, 337, 13 P.3d 1235, 1242 (citation omitted), reconsideration denied, 94 Hawai`i 403, 15 P.3d 815 (2000). At the summary judgment stage, however, Sierra Club can no longer rest on the mere pled allegations, but must demonstrate that it meets standing requirements by setting forth specific uncontroverted facts through affidavit or otherwise. See Hawai`i Rules of Civil Procedure Rule 56(e).
[19] For example, Robert Parsons avers that more visitors will affect the State's water supply, sewage capacity, electric power generation, landfill capacity, fossil fuel consumption and pollution, and harbor and airport usage. Roberta Lynn Brashear avers that she does not want increased tourism to "negatively affect my health and well being." Without more, these are generalized political grievances or "value preferences" not susceptible to a judicial forum. See Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 283-84, 768 P.2d 1293, 1299 (1989).
[20] The environmental council, consisting of up to fifteen members appointed by the governor, see HRS  341-3(c), serves "as a liaison between the director [of the office of environmental quality control] and the general public[.]" HRS  341-6. Among the functions of the council is to "monitor the progress of state, county, and federal agencies in achieving the State's environmental goals and policies[,]" including those in chapter 343. Id.
[21] HRS  201B-3(16) gives HTA authority to "[d]evelop and implement the state tourism strategic marketing plan ... to promote and market the State as a desirable visitor destination[.]"
[22] Notwithstanding the fact that I would hold that Sierra Club has standing to assert its claims, the plurality's holding in this case renders any discussion as to the merits of those claims futile. Nevertheless, the plurality felt compelled to state:

[I]t is incongruous for the dissent to conclude that Sierra Club has standing but at the same time maintain that it need not say what its position would be as to the merits of the present case.
Plurality op. at 257, 59 P.3d at 892. As previously indicated, "say[ing] what [my] position would be as to the merits of the present case" would be futile insofar as any discussion of the merits would amount to nothing more than an advisory opinion by a minority of this court that has no precedential effect whatsoever. This is not a case in which the majority and minority disagree as to the disposition of the merits. The resolution of this case rests entirely on whether Sierra Club has standing. Having decided it does not, the plurality's holding renders every other issue moot. Thus, despite the fact that the minority would hold otherwise with respect to the issue of standing, engaging in a protracted discussion of the merits would not only be fruitless, but ill-advised. In light of its holding, the plurality's statement that "[w]e would not find that argument [(i.e., that HTA is not an agency and, therefore, not under an obligation to produce an EA)] meritorious," id., is equally ill-advised.